EVERS, J. T. C.
These 1977 and 1978 local property tax appeals by the taxpayer involve the valuation of 20 contiguous tax lots which are assessed as four line items and improved with a one and two story structure used for light manufacturing — industrial purposes. The history of assessments and County Board action follows:
Block 1602, Lot 25-28 Block 1602, Lot 29-30 & 39h10
Assessment County Board Assessment County Board
Land $97,600 $97,600 $80,000 $80,000
Improvement ___ 5,000 5,000
Total $97,600 $97,600 $85,000 $85,000
Block 1602, Lot 31-38 Block 1602, Lot 41-44
Assessment County Board Assessment County Board
Land $131,200 $131,200 $81,200 $81,200
Improvement 622,800 355,000 700 _700
Total $754,000 $486,200 $81,900 $81,900
The premises are situated in a residential zone which, among other uses, allows multi-family buildings, including high rise. This zoning is in keeping with the building trend in the borough which has seen the construction of many mid and high rise multi-family structures, some of which are in close proximately to the subject premises. Other neighborhood uses include shopping centers, residences, garden apartments and some undeveloped land.[1] The taxpayers non-conforming use represents the only industrial use in the area. The site, which has frontage on three improved streets, is rectangular in shape and contains 1.27 acres. It is serviced by all public utilities.
The structure, which contains 32,404 square feet, was originally constructed in 1962 and expanded in 1968. The 20 foot high building was considered to be in good condition. The site is also *233 improved with a 70 vehicle macadam paved parking lot. The premises at the time of the assessing dates, was leased on a net basis with expenses and taxes paid by the tenant. The term commenced in March 1970 and the annual rent was $72,000. Additional rent in the amount of $4,740 was also paid to the taxpayer-lessor. In September 1978 a new net lease was executed requiring an annual rent of $86,940 for the first two years and $95,648 for the balance of the five year term.
As is often the case in such matters, the respective appraisers differed markedly in their conclusions of value. Taxpayer’s witness estimated the value at $625,000 and the borough’s expert concluded it to be $972,000.
Based on a general study of land values throughout the municipality, the borough’s expert determined that the total land assessment of $390,000 or $307,087 per acre represented its true value. No details were given with respect to the study. Taxpayer’s witness concluded the land to have a value of $291,-500 based on the market data (comparable sales) approach. In support of his opinion he relied on two sales transactions of vacant parcels, the second of which the witness acknowledged deserved little weight because of its remoteness to the subject in terms of distance, geographical location, area characteristics and date of the sale, (December 1972).
The subject of the first sale was a vacant parcel located in the same tax block as the subject. It contained 25,000 square feet and was sold in June 1974 for $200,000 or $8 per square foot. In comparing the sales premises with the subject, he stressed that because the intensity of the proposed multi-family use of the former was greater than the industrial use of the latter, a decrease in value was warranted. He also urged that an industrial use was incompatible with the neighborhood and suggested that it was now or soon would become a nuisance. These arguments, however, were more than offset by the fact that the subject premises has frontage on three streets and is superior in terms of topography while the sales property had no improved street frontage at the time of the transaction. Everything considered, it appears that this sale represented more of a hindrance than a help to the taxpayer. I note that the 1974 *234 sales price of $8 per foot exceeded the $7.06 per foot value established for the subject property two years later.
The testimony of both experts with regard to the value of the land is accorded no weight. While the borough expert indicated that the land value was even greater than the assessment, his testimony was unsubstantiated. I find that the presumption of correctness of the County Board judgment as to the land value controls. Aetna Life Insurance Co. v. City of Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952).
Both experts employed the market data and income approaches in valuing the entire premises. The basis of my rejection of the use of the market approach is two-fold. I find that the degree of similarity which is necessary for the court to make a reasonable comparison of the sales and' subject properties was lacking in the four sales testified to by the taxpayer’s witness. All were located in industrial park type settings in other taxing districts and were relatively recently constructed. The sales approach is often effective in determining value for property tax purposes, but only where there is a substantial similarity between the properties demonstrating reasonable comparison. (Emphasis supplied). Newark v. West Milford, 9 N.J. 295, 88 A.2d 211 (1953) and Venino v. Carlstadt, 1 N.J.Tax 172 (1980). The borough’s reliance on an August 1975 sale of industrial premises in Fort Lee which, at least superficially, supports its position was thoroughly neutralized by the taxpayer. The uncontroverted facts demonstrated that the purchase price may have been inflated by factors extraneous to the value of the property itself. The purchaser was the sole tenant whose operation required the use of heavy machinery and equipment. In acquiring ownership of the building, the cost of uprooting the business and the equipment and re-establishing the operation elsewhere was avoided. However, it is more than a mere probability that the cost and inconvenience factors were considered in establishing the sales price. I do not question the bona fides of this transaction, but my awareness of the foregoing facts undermines its reliability for valuation purposes.
The use of the market approach is further rejected because in these circumstances I find the most persuasive approach *235 to be the income approach to value. The sales prices of like structures means comparatively little to an investor if the property does not provide an adequate return to justify the sales price. Parkview Village Association v. Borough of Collingswood, 62 N.J. 21, 297 A.2d 842 (1972). The logical justification for the income approach to value is the
“.. . common knowledge that a prospective investor in realty expects a fair return upon any investment he makes, and, before investing, studies the income history of the property and considers its income producing potentiality.” Annotation, “income or rental value as a factor in evaluation of real property for purposes of taxation,” 96 A.L.R.2d 666, 669 (1964).
In their income approaches the experts differed in their estimate of gross income and capitalization rate. They agreed in the use of a 3% vacancy factor and 8% of gross income for expenses. Both rejected the use of the actual rent paid pursuant to the lease in effect at the time of assessments. I too reject that rent because the amount thereof was established in 1970. Taxpayer’s expert claimed that the $86,940 ($2.68 per square foot) rental to be paid in the first two years of the subsequent lease represented economic rent. The borough’s expert stabilized the rent at $3 per foot for a gross income of $97,212 or some $1,500 per year more than the rent to be paid by the tenant in the 1981-1983 term. No effort was made to establish this rent on the basis of comparable leases. The main support for the use of $3 per foot came from his general knowledge of rents in Fort Lee. The witness’s familiarity with Fort Lee properties is not doubted. That familiarity and experience, however, should have been reduced to concrete facts and made part of the record. It was not and without such data I can give no weight to his opinion. For the same reason, i. e., no supporting data, no weight is accorded to his opinion that the lease rent did not represent economic rent because the premises were not being used to their greatest potential. Based on that reasoning the same may be said of the many borough properties that are not used for multi-residential or commercial purposes. Such reasoning is frought with speculation, finds no support in the record and is unacceptable. The determination of the weight to be given the testimony of an expert witness is for the trier of fact and that weight depends not only on the candor, *236 intelligence, knowledge and experience of the witness, but also on the facts and reasoning which form the foundation of the expert’s opinion. In re Port of New York Authority, 28 N.J.Super. 575, 101 A.2d 365 (App.Div.1953); Passaic v. Gera Mills, 55 N.J.Super. 73, 150 A.2d 67 (App.Div.1959), certif. denied 30 N.J. 153, 152 A.2d 171 (1959).
In support of his use of the subsequent lease rent, taxpayer’s expert- referred to five leases of alleged comparable properties located in other taxing districts. Little testimony was adduced with regard to their comparability to the subject. As is the case with respect to sales prices, so too rents of properties in other taxing districts may be influenced by factors such as stable tax rates, road nétwork, labor markets and zoning. For the reasons the alleged comparable sales were rejected, I give no weight to the leases offered by the taxpayer. In the view I take of this matter, however, such rejection is not fatal to taxpayer’s use of the lease rent as economic income.
Contract rent is that rent which is “payment for the use of property as designated in a lease”. American Institute of Real Estate Appraisers, the Appraisal of Real Estate (7 ed. 1978) at 325. Economic rent is the “rental warranted to be paid in the open real estate market based on current rentals being paid for comparable space”. Ibid. There is no doubt that economic rent or fair market rental, if it differs from actual or contract rent, must control. New Brunswick v. State Division of Tax Appeals, 39 N.J. 537, 544,189 A.2d 702 (1963). Parkview Village Association v. Borough of Collingswood, supra, 62 N.J. at 29, 297 A.2d 842. In the search for economic rent, actual rent is not to be ignored. McCrory Stores Corp. v. Asbury Park, 89 N.J.Super. 234, 243, 214 A.2d 526 (App.Div.1965). Indeed it may be that contract rent is a significant factor in the search for economic income. Parkview Village Association v. Borough of Collingswood, supra, 62 N.J. at 30, 297 A.2d 842. It was said in Parkview, at 34, 297 A.2d 842,
In the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project like this, functioning as customary with leases of relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income method of *237 property valuation. A court or taxing agency should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent. That approach, we believe, conduces to the objective of relative stability of assessments which we have heretofore held to be basic to sound tax assessment policy. (Citations omitted). Readily to be distinguished is the case of a taxpayer owning commercial property tied to a long term lease made long before the current assessing date, where the present rent may well be out of line with current fair rental value.
The record supports a finding that the lease rent resulted from an arms length transaction. For 1978 and 1979 the net rent was $2.68 per foot while provision was made for an increase to $2.95 per foot for subsequent years. I do not view the use of a lease which became effective subsequent to the assessing dates as being violative of New Brunswick v. State of New Jersey Division of Tax Appeals, supra, where in dealing with diminished rentals which occurred after the assessing date, Chief Justice Weintraub said, at 545,
“... valuation, although based upon a forecast of earnings, must be found upon what was known and anticipated as of the assessing date, unaided by hindsight.”
Here, even the taxpayer’s expert declined to use the lease rent in effect as of the assessing date. It was recognized that the rent actually being paid in the amount of $2.37 per foot was simply too low in light of the ever rising real estate values in general and particularly in Fort Lee. As a result, in 1978 a new lease increased the rent by approximately 13%. An additional 10% increase was subsequently provided for. It has been recently held that sales subsequent to the assessing date may be considered in the valuation process. In Almax Builders, Inc., 1 N.J.Tax 31, 37 (1980), it was stated:
So long as a proffered sale is not remote, the sale should be admitted for Its rational probative valuation inference. This court is constrained to conclude that a strict interpretation of the language in New Brunswick v. Division of Tax Appeals, supra, is not controlling on the issue involved herein since that case did not concern sales after a valuation date but rather diminished rental incomes subsequent to an assessment date. One cannot deny the logic of the equal rational probative value of a sale which occurs one day after the assessment date compared to its occurrence one day prior to such date. Appraisal experts are capable of making adjustments for time. As a matter of appraisal theory, adjustments must be made for time in any event in order to render a comparable sale an indication of value for the property under consideration. American Institute of Real Estate Appraisers, the Appraisal of Real Estate, supra, at 281.
I do not consider a lease of the subject premises which became effective in one of the tax years in question and which was *238 obviously negotiated prior to its effective date too remote for consideration. It demonstrates the natural rise in rents during the period in question which were obviously to be anticipated as of the assessing dates. The lease rent is not the sole indicator of income, but it is corroborative of a known fact, i. e., future rent increases, as of the assessing date. Its use is consistent with the reasoning and the approaches utilized by both parties. See In re Erie Railroad System, 19 N.J. 110, 130, 115 A.2d 89 (1955); New Brunswick v. State of New Jersey Division of Tax Appeals, supra, 39 N.J. at 545, 189 A.2d 702; and Parkview Village Association v. Borough of Collingswood, supra, 62 N.J. at 29, 297 A.2d 842. Additionally, it is to be noted that the lease is of relatively short duration and that the record does not even hint that the structure was ill managed. Accordingly I agree with the position of the taxpayer to the effect that $86,940 represented the economic rent.
I further agree with both witnesses and find that a 3% allowance for vacancies and 8% for expenses are fair and reasonable. Accordingly the income available for land and improvements is $77,585 as advanced by the taxpayer.
Employing a hybrid band of investment technique, the taxpayer’s expert determined a fair capitalization rate to be 13.1%. He assumed an equity investment of 30% and a 70% mortgage with interest rates of 12% and 10% respectively, which resulted in a total interest rate of 10.6%. To this he added a recapture rate of 2.5% based on a 40 year economic life for a total (rounded) rate of 13%. The witness relied only on his general experience and expertise in making his findings.
The borough’s witness, based also on his general knowledge and experience, estimated a fair interest rate to be 8.5%. He allowed 1% for recapture for a total capitalization rate of 9.5%.
I disagree with the capitalization rates advanced by both experts. Neither witness referred to any recognized authorita *239 tive sources in support of his conclusions. It is not only my right but my duty to construct a capitalization rate and make an independent determination of value. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965).
In making that determination, I find that for the period in question in that locale and in consideration of the use, an interest rate of 9.5% is fair and reasonable. In making this finding, I am not unmindful of taxpayer’s claim that the nonconformity of the use in terms of zoning gives rise to a greater risk which should be reflected in the capitalization rate. The taxpayer, of course, refers to the suspected difficulties to be encountered should it attempt to expand its operation. While that claim may be supportable in some circumstances, it has no application here where the value of the land for conforming uses, at least, offsets any loss which may result from zoning restrictions.
I further find that a recapture of the investment at the annual rate of 2% is also reasonable. I will therefore capitalize the income at a total rate of 11.5%. The net income will be capitalized before taxes in accordance with Humble Oil & Refining Co. v. Englewood Cliffs, 71 N.J. 401, 365 A.2d 929 (1976).
Based on the foregoing, a recapitulation of the income approach follows:
Gross income $ 86,940
Less 3% vacancy allowance 2,608
Estimated gross effective income $ 84,332
Less 8% expense allowance 6,747
Net income $ 77,585
Income to land ($390,000 x 9.5%) 37,050
Income to improvements $ 40,535
Capitalized at (9.5% plus 2.0%) 11,5
Value of improvements (rounded) $352,500
Add land value 390,000
Total value $742,500
*240 The Clerk of the Tax Court shall enter judgment for 1977 and 1978 as follows:
Block 1602, Lot 25-28 Block 1602, Lot 29-30 & 39-40
Land $97,600 $80,000
Improvement 5,000
Total $97,600 $85,000
Block 1602, Lot 31-38 Block 1602, Lot 41-44
Land $131,200 $81,200
Improvement 346,800 _700
Total $478,000 $81,900

 Subsequent to the assessment dates herein, at least some of the nearby vacant land was improved with townhouses.