CONLEY, J. T. C.
This action is a valuation and discrimination appeal for the years 1975, 1976, 1977 and 1978, although only Block 1, Lot 2, was appealed in the year 1975. The property consists of nine contiguous lots used as a quarry. The assessments placed upon the lots for 1976,1977 and 1978 (and including Block 1, Lot 2, for 1975) were as follows:
Block Lot Land Improvements Total
1 1 $ 16,300 $ 16,300
1 2 1,704,900 $300,200 2,005,100
1 3 23,100 23,100
5 1 324,500 900 325,400
5 5 378,100 378,100
5 14 58,500 58,500
5 173-2 54,900 54,900
5 174 396.000 396.000
5 175 473.000 473.000
Total $3,429,300 $301,100 $3,730,400
As can be seen from these figures, the aggregate assessment of all the lots involved in this appeal was $3,730,400. The individual assessments were all affirmed by the Somerset County Board of Taxation each year.
Plaintiff’s expert contends that the fair market value of the subject property for all years in question was $2,452,000. Defendant township’s expert contends, in a supplement to his appraisal, that the fair market value of the subject property for the years in question was $4,438,400. The appraisal experts for both plaintiff and defendant were of the opinion that for *448 assessment purposes the fair market value of the property should be adjusted by application of a ratio (or an average of ratios) promulgated by the Director of the Division of Taxation for purposes of distribution of State school aid.

Issues

Plaintiff did not challenge the two assessments on improve-ments and neither party offered any proofs on the valuation of improvements. Accordingly, the only issues to be resolved by the court are the appropriate valuation of the nine parcels of land constituting the subject property and the appropriate ratio to be applied for discrimination relief for each of the years in question.

Physical Description

The nine lots in question constitute two separate portions of the property, known as the west quarry and the east quarry. The lots known as the west quarry are:
Block 1, Lot 1 1.90 acres
Block 1, Lot 2 178.90 acres
Block 1, Lot 3 2.30 acres
Total - 183.10 acres
The six lots known as the east quarry are:
Block 5, Lot 1 32.45 acres
Block 5, Lot 5 58.20 acres
Block 5, Lot 14 6.00 acres
Block 5, Lot 173-2 5.49 acres
Block 5, Lot 174 39.60 acres
Block 5, Lot 175 49.00 acres
Total - 190.74 acres
All nine lots together total 378.84 acres. The property is located in the southern portion of Franklin Township, approximately 3.5 miles northeast of the center of Princeton. The surrounding area is one of the less-developed portions of Franklin Township. The subject property is not presently serviced by *449 water and sewer connections but these systems could be extended to the site in the foreseeable future.
A quarry has been located on the site since approximately the turn of the century. Originally, the west quarry was the location of almost all mining activity. During the years in question all nine lots were capable of being mined, but since the original mining had taken place in the west quarry and it was to a considerable extent depleted, most of the mining activity during the years in question took place in the east quarry. Stone extracted from the east quarry was transported through a tunnel under a public road to the west quarry where there was a crushing machine, a concrete and asphalt plant, a scale house, machine shops, central receiving facilities and garages.
The mining process undertaken on the subject property consists of the blasting and extraction of diabase trap rock, which in its finished form is crushed stone used as a base in roadways, asphalt mixtures and ready-mixed concretes. At the beginning of the process, holes are drilled into the solid rock of the quarry floor about every 15 feet to a depth of approximately seven feet. Explosives placed into the holes break up the rock. The rock debris is then crushed into gravel by machine.
As the rock in the floor of the quarry is extracted for use as trap rock, the topography of the property obviously changes. What was originally an outcropping of rock is gradually blasted away within a circumscribed area, leaving a perpendicular edge or face to the remaining rock. In the east quarry at the time of trial one area of excavation had a face of 160 feet and above that another area that had been excavated previously had a sheer face of 65 feet. As excavation progresses outward as well as downward, the rock face is moved outward, although a buffer zone is left between the ultimate face of the quarry and the boundary of the property.

Highest and Best Use

The parties differ in their analyses of the highest and best use of the subject property. In plaintiff’s expert’s view, the highest *450 and best use is a continuation of its current use as a quarry, but only for its remaining economic life which he estimates to be about 15 years. He stated that after the quarry ceased being used, plaintiff would implement its reclamation plan, which would consist essentially of grading and planting, leaving a safe property with a lake filling the excavated area. After reclamation, the highest and best use of the property in the expert’s view would be for conservation or passive recreation in accordance with the site plan approved by Franklin Township. .He said the property would not be suitable for any other uses. The expert said most abandoned quarries were “swimming holes” that were never reclaimed. He said that even after reclamation of the subject property, there would be virtually no market for it for light manufacturing, as permitted under the township’s ordinance, because there is a huge surplus of industrial land in Central New Jersey with better location, topography and access.
Defendant’s expert did not deal with the issue of highest and best use in his appraisal report but he did not suggest a better use for the property than as a quarry. He said that upon depletion of the quarry the land would revert to some other use, as permitted by the township zoning ordinance. It was his opinion that a goodly portion of the land would ultimately be usable for light industrial or office use, although he conceded that it would not be the best site in Franklin Township for these uses.
It is my conclusion that the highest and best use of the property is its present use as a quarry. At such time as the quarry becomes depleted or it becomes uneconomical to continue the quarry operation, the highest and best use of a relatively small portion of the property would be for light industrial development. The larger portion of the property, the portion actually quarried, would be developable for industrial use only at considerable expense not adequately established in this court. Without such an expenditure the larger portion would be virtually unusable except for recreation or conservation purposes.

*451
True Value

The Somerset County Board of Taxation each year affirmed all the individual assessments at issue in this case. Judgments of a county board of taxation are presumed to be correct, and the presumption is overcome only by the introduction of sufficient competent evidence to enable this court to determine the true value of the property. Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 104-105, 89 A.2d 385 (1952); Riverview Gardens v. North Arlington, 9 N.J. 167, 174-175, 87 A.2d 425 (1952); Passaic v. Botany Mills, Inc., 59 N.J.Super. 537, 542-545, 158 A.2d 205 (App.Div.1960). Once the presumption of the correctness of the county board judgment has been met, this court must appraise the testimony and determine the true value of the subject property and its appropriate assessment. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 74-75, 208 A.2d 153 (App.Div.1965). The standard of proof is that of the preponderance of the evidence. N.J.S.A. 2A:84A-5.
In their appraisals both experts based their opinion of value upon the income approach. They both unequivocally rejected the reproduction cost approach as an appropriate method of valuation of a quarry. They both decided not to rely upon the market approach because the sales of what might be comparable quarry properties involved the sale of more than mere real estate, and it was not practicable to break out a portion of such a sale price to attribute to real estate as opposed to the value of an ongoing business or the sale of business personal property. Other sales of property reviewed by the appraisers were simply not comparable to the subject property in their own opinions.
Although both experts relied upon the income approach, they employed different income methodologies. Plaintiff’s expert used what he called an annuity capitalization method, and defendant’s expert used what he called a capitalization of royalty income method. The essential difference between the approaches was that plaintiff’s witness estimated a stabilized net annual income of the quarry operation from financial statements of Trap Rock Industries, Inc., whereas defendant’s wit *452 ness derived from the marketplace a royalty charge per ton that in the normal case would be paid to the owner of a quarry for the right to extract stone from the property. Both experts used a 10% interest rate in their capitalization process, plaintiff for a 15-year remaining economic life of the quarry and defendant for 19 years. Both experts then added a reversionary value of the land as of the time the quarry becomes depleted, each such value being based upon a calculated value per acre for the entire acreage.
It is my conclusion from reviewing the experts’ testimony and reports and the trial exhibits that the royalty income method advocated by defendant’s expert witness is to be preferred in the valuation of the subject property. This approach is inherently more reliable because it derives its data from economic forces prevailing throughout the quarry industry and because it requires fewer adjustments to the data that is used. The royalty method is frequently used in the valuation of quarries. Davis, “Income Approach to Value of Quarry Lands,” 2 Assessors Journal 32 (Oct. 1967). The approach used by plaintiff’s expert is too dependent on specific figures obtained from a particular quarry operator, not economic figures more generally applicable. Cf. Parkview Village Associates v. Collingswood, 62 N.J. 21, 297 A.2d 842 (1972). In the present case, as defendant pointed out, it is very difficult to sort out reliable income and expense information from the taxpayer’s records because of the existence in the original data base of unrelated income and expenses and because of the problem of apportioning the data not only among interrelated companies but also between the real estate and the business operation conducted on the subject property.
Defendant’s expert employed a royalty figure of $.20 a ton in his computations. However, his market data indicated royalty, payments of only $.08, $.10V2 and $.10 a ton. He indicated that he had adjusted these figures upward because he was convinced that the subject property had a competitive advantage in terms of location, so that its operators would not *453 have to charge trucking costs as high as the other quarries and thus could command a higher royalty. I find defendant’s expert’s testimony on this point quite weak. The rebuttal testimony of one of plaintiff’s officers convinced me that the operators of the subject property do not have a substantial competitive advantage over other operators in the same market, although the plaintiffs have perhaps a slight advantage by virtue of location and higher volume. Accordingly, I will adopt a royalty figure of $.12 a ton as being reasonable for the period in question.
The experts did not differ significantly in their use of a figure for tons of trap rock sold each year. Plaintiff used a stabilized figure from the years 1973 through 1977 of 2,250,000, whereas defendant used an average for the same period of 2,287,600. I find plaintiffs stabilized figure to be more reliable, particularly since the 1977 total was only 2,252,711 and the 1973 total was 2,755,112. It is apparent that there would be some slight distortion if an average were used for the tax years 1975 through 1978. Use of the figures set forth above indicates an annual net income figure for the subject property of $270,000 (2,250,000 tons X $.12/ton royalty).
I find that the remaining economic life of the quarry is 15 years, as indicated by plaintiff. In fact, the testimony of another of plaintiff’s officers convinced me that the remaining life of the quarry is more likely to be less than 15 years.
Both experts capitalized their net income figure using a 10% interest rate. Plaintiff’s expert properly added a real property tax factor. New Brunswick v. Tax Appeals Div., 39 N.J. 537, 546-547, 189 A.2d 702 (1963). Although the expert’s factor of 2.81% was developed by use of the actual tax rate for only the year 1976, whereas three other years are also at issue, the factor developed using all four years is virtually the same, 2.83% (the product of the average of the tax rates for 1975, 1976, 1977 and 1978 multiplied by the average of the Director’s ratios for the same years). Accordingly, since the difference is de minimis, I will adopt plaintiff’s rate of 2.81%. This determines the annuity *454 factor for 15 years at 6.65195. Application of this factor to the net income of $270,000 produces a value based on the income stream of $1,796,026.
The reversionary value of the 373.84-acre tract after depletion of the mineral deposits must be added to the indicated value of $1,796,026. Plaintiff used a $3,000 an acre value and defendant used a $10,000 an acre value. Defendant’s figure was based on an eventual use of all the land for industrial purposes. This is not likely without very substantial expenditures to fill and prepare the quarry site for such a use. No testimony was offered on the amount of such costs. On the other hand, plaintiff’s expert’s raw-land sale analysis (for testing the reasonableness of his land values derived from the income approach) demonstrated a present value of $1,500 to $3,000 an acre for residential and industrial land in the vicinity of the subject property. The expert also made an unsupported statement that land acquired for conservation purposes was worth about $1,000 to $1,500 an acre. I conclude that the future value of the subject property will be in the approximate amount of $5,000 an acre, taking into account the vagaries of inflation and development trends and the fact that some of the subject property will not require fill and grading to be usable. Application of plaintiff’s expert’s reversion factor of .147886 produces an indicated value of $276,435 (373.85 acres X $5,000/acre = $1,869,250, X .147886). This amount, added to the amount derived from capitalization of the income stream, indicates a total value of the subject property of $2,072,461, rounded to $2,072,500.
In reaching this determination I have considered but given little weight to the original assessment on the property which was computed at $10,000 an acre. The assessor testified at trial as a valuation expert in addition to defendant’s appraiser, but the assessor’s opinion was based upon sketchy financial information and market data that was not really comparable. The income approach employed by defendant’s appraiser was based upon more information and I consider it to be the township’s position in this litigation.
*455 There was considerable confusion as to the status of Block 5, Lot 5, with regard to farmland assessment. The assessor had no personal knowledge of any farming activity. Plaintiff offered no proof that farming had taken place during the years in question. Accordingly, I do not find that Block 5, Lot 5, was entitled to farmland assessment and it will be valued and assessed in the same manner as the remainder of the land of the subject property.
Finally, both parties have presented one valuation figure for all four years at issue. No proofs having been offered as to different values for different years, the value I have determined will apply to all four years.

Discrimination

Both parties have applied a ratio to the true value determination proposed by the experts. Plaintiff used an average of the four Director’s ratios and defendant applied each year’s ratio to the valuation to determine a separate proposed assessment for each year. Neither party suggested the use of the certified ratio pursuant to chapter 128 of the Laws of 1973 and I therefore deem its application to be waived. In the interest of stability in assessments and because multiple years are at issue, I will average the Director’s ratios and apply 67.12% to the indicated true value of the land portion of the subject property for all years, which produces an aggregate land assessment of $1,391,100. The aggregate assessment of the improvements in the amount of $301,100, which were not challenged by plaintiffs, must be added to the land valuation, for a total aggregate assessment of $1,692,200.
Since all of the land has been treated throughout as if of uniform value, I will allocate the aggregate land assessment among the nine lots strictly according to acreage at $3,721/acre ($1,391,062 373.84 acres). Thus, the assessments for the nine lots for the years 1976,1977 and 1978 (and for Block 1, Lot 2, for 1975) will be as follows:
*456 Block Lot Land Improvements Total
1 1 $ 7,100 $ 7,100
1 2 665.700 $300,200 965,900
1 3 8,600 8,600
5 1 120.700 900 121,600
5 5 216,600 216,600
5 14 22,300 22,300
5 173-2 20,400 20,400
5 174 147,400 147,400
5 175 182,300 182,300
Total $1,391,100 $301,100 $1,692,200
The Clerk of the Tax Court will enter judgment.