PER CURIAM.
Massachusetts Mutual Life (Mutual) appeals from Tax Court judgments upholding the real property assessments for the tax years 1991,1992,1993 and 1994 of an office building located at 300 Harmon Meadow Boulevard in the town of Secaueus, Hudson County, New Jersey. Hereafter we shall refer to this property as the property in question or “PQ.” The relevant assessing dates are October 1, 1990, 1991, 1992 and 1993. The PQ was assessed for each of those years in the amount of $13,250,000.
Originally built in the 1980’s by Hartz Mountain Development Co., the PQ contains approximately 125,000 square feet of rentable space in a six-story building. The PQ was part of a mixed use project known as Harmon Meadow. The project contains office buildings, hotels, theaters and retail uses. In mid-1992, the appellant, Mutual, acquired the property from Hartz Mountain by a deed in lieu of foreclosure. Thereafter, Mutual substituted for Hartz in the pending 1991 and 1992 tax appeals, and filed direct appeals from the 1993 and 1994 assessments. The cases were consolidated and tried on September 21 and 26, 1994, and the court rendered a written opinion.
On appeal, Mutual contends that the Tax Court erred because it failed to consider a prior contradictory report rendered by the town’s expert witness which “conceded that a reduction in assessment was appropriate.” Mutual also contends that the Tax Court erred in finding an economic rent “widely divergent from actual, recent leases in the record.”
Mutual’s expert determined the true value of the PQ to be $7,950,000 on October 1, 1990, $8,120,000 on October 1, 1991, $8,335,000 on October 1, 1992, and $8,635,000 on October 1, 1993. *477 In arriving at these estimates he used the income capitalization approach to value. See Parkway Village Apartments Co., v. Township of Cranford, 108 N.J. 266, 270, 528 A.2d 922 (1987) (citing Helmsley v. Borough of Fort Lee, 78 N.J. 200, 394 A.2d 65 (1978)). These estimated true values were primarily based on eight leases within the subject property:
Tenant Inception Expiration Rent (sq.ft.)
Bank of America 08/15/93 5.5 years $15.03
Sanyei America 06/15/93 06/15/98 $18.50
PM Group Ins. 04/15/93 04/15/98 $16.75
AST Research 01/01/93 12/31/96 $14.05
Inehcape 01/15/93 01/15/98 $15.67
Shinwah USA 12/01/92 12/01/97 $15.67
American President 01/03/90 5.16 years $15.00
Fireman’s Fund 03/27/89 03/26/94 $17.00
The estimated true values were also secondarily based on nine leases in a building in the Town of Lyndhurst which plaintiffs expert deemed comparable to the PQ:
Tenant Inception Expiration Rent (sq.ft.)
Taree ' 12/90 12/95 $18.50
W. Braun Co. 4/90 03/95 $15.00
IBP Service Ctr. 06/93 05/98 $13.75
Nedco 08/92 08/93 $7.50
Comtel Computer 12/92 03/98 $13.03
Medi Promotions 05/91 05/97 $12.00
Libby Glass 09/91 09/96 $15.57
Charles T. Main 06/91 05/94 $15.00
Intl.House of Pancakes 05/93 05/98 $14.75
From these comparable leases, plaintiffs expert estimated a stabilized economic rent of $15 a square foot for all years or $1,887,300 annually. He deducted a 20% vacancy allowance and $534,735 estimated expenses, and applied a capitalization rate of 11.70% for 1991 and 1993, 11.50% for 1992, and 11.29% for 1994. His capitalization rates were developed under the band of investment mortgage-equity method.

Secaucus’s Expert

The Town’s expert, also utilizing the income capitalization method, determined the PQ’s true value to be $15,100,000 for 1991, $14,065,000 for 1992, $13,675,000 for 1993, and $13,325,000 for *478 1994. The expert’s opinion was primarily based on eighteen leases in office buildings in the Harmon Meadow complex other than the PQ:
Address Tenant Inception Reni/Sa.Ft
500 Plaza Dr. Rockwell Int’l 05/15/89 $20.00
450 Harmon Meadow Doctors Billing Svcs 07/21/89 $20.00
400 Plaza Dr. Fitzpatrick & Israels 11/20/89 $21.00
450 Harmon Meadow Delphi Info. Systems 04/10/89 $21.35
400 Plaza Dr. Siemens Nixdorf 12/01/90 $18.50
450 Harmon Meadow Ericcson Bus. Comm. 04/13/90 $20.00
400 Plaza Dr. Litton Systems, Inc. 12/01/90 $20.00
300 Lighting Way Waters, McPherson 02/26/90 $22.67
400 Plaza Dr. Progressive Casualty Ins 07/29/91 $18.50
300 Lighting Way Ducair Tsumura 05/07/91 $19.14
300 Lighting Way NYK Line, Inc. 01/12/91 $19.91
300 Lighting Way Cognos Corp. 11/25/91 $20.00
400 Plaza Drive ProKocimer Int’l Ent. 08/28/92 $17.00
300 Lighting Way J.D. Edwards & Co. 05/08/92 $18.75
500 Plaza Drive Scarcini & Hollenbeck 04/01/92 $19.80
500 Plaza Drive Nat. Elec. Info. Corp. 04/01/93 $17.00
500 Plaza Drive Scarcini & Hollenbeck 08/11/93 $17.00
300 Lighting Way NYK Line, Inc. 07/19/93 $18.00
Sixteen leases within the subject property were also considered in estimating true value:
Tenant Inception Expiration Rent (sq.ft.)
Wescol Shipping 05/01/87 04/30/92 $18.75
John Hancock 02/01/88 01/31/93 $18.05
Hesco Holding Corp. 05/23/88 05/22/93 $19.46
AST Research 07/31/88 07/30/94 $20.50
Fireman’s Fund 03/27/89 03/26/94 $17.00
Bertolli USA 05/01/89 04/30/94 $18.86
1st Nat. Bk Chicago 08/01/89 07/31/99 $20.00
Wescol Shipping Extension 08/31/92 $18.75
Wescol Shipping 09/01/92 11/30/92 $16.50
1st Nat. Bk Chicago 01/01/93 06/30/94 $16.50
Inchcape 03/01/93 02/28/98 $14.66
Shinwha USA 03/01/93 02/28/98 $15.68
PM Group Ins. 05/21/93 05/20/98 $16.75
Sanyei America 08/30/93 08/29/98 $18.50
Bank of America 09/03/93 09/02/98 $16.00
AST Research Extension 12/31/96 $16.00
From these comparable leases, the Town’s expert estimated a stabilized economic rent of $20 a square foot on October 1, 1990, $19 a square foot on October 1, 1991, $18.50 a square foot on October 1, 1992, and $18 a square foot on October 1, 1993. He thus calculated gross income for 1991,1992,1993,1994 respective *479 ly as $2,516,400, $2,390,580, $2,327,670, $2,264,760. From the economic income thus derived he deducted a 10% vacancy allowance and operating expenses for 1991,1992,1993, 1994 respectively of $471,643, $434,927, $362,094, and $441,008. Like plaintiffs expert, he utilized the band of investment mortgage-equity method to develop his capitalization rates of 11.46% for 1991, 11.56% for 1992,11.51% for 1993, and 11.42% for 1994.
The trial court found the Town’s expert’s analysis to be more credible and, therefore, did not disturb the assessments.
We recognize the unique role of the Tax Court in determining issues such as those before us. As noted in Glenpointe Associates v. Township of Teaneck, 241 N.J.Super. 37, 574 A.2d 459 (App.Div.), certif. denied, 122 N.J. 391, 585 A.2d 392 (1990): “The judges presiding in the Tax Court have special expertise; for that reason their findings will not be disturbed unless they are plainly arbitrary or there is a lack of substantial evidence to support them.” Id. at 46, 574 A.2d 459. See N.J.S.A. 2B:13-6b; see also Pine St. Management Corp. v. City of East Orange, 15 N.J.Tax, 681, 688 (App.Div.), certif. denied, 144 N.J. 172, 675 A.2d 1121 (1996). Our scope of review in a ease such as this “is limited to determining whether the findings of fact are supported by substantial credible evidence with due regard to the Tax Court’s expertise and ability to judge credibility.” Phillips v. Township of Hamilton, 15 N.J.Tax, 222, 226 (App.Div.1995) (quoting South-bridge Park, Inc. v. Borough of Fort Lee, 201 N.J.Super. 91, 94, 492 A.2d 1026 (App.Div.1985)). See also Romulus Dev. Corp. v. Township of Weehawken, 15 N.J.Tax, 209, 211 (App.Div.1995); Ford Motor Co. v. Township of Edison, 127 N.J. 290, 311, 604 A.2d 580 (1992).
Applying these principles, we conclude that the judgment must be affirmed.
Plaintiffs expert, Robert McNearney, relied on leases for space in the PQ for terms commencing in 1993 as well as a 1992 lease, a 1990 lease and a 1989 lease. McNearney gave little, if any, probative value to leases commencing in the late 1980’s because *480 thereafter the market had changed due to a downturn in the business cycle. McNearney also ignored leases in other Harmon Meadow buildings because, in his opinion, they were better buildings than the PQ and, therefore, were not comparable. Instead, McNearney relied on a building in nearby Lyndhurst, New Jersey, for supporting comparables.
The Town’s expert, Louis Izenberg, relied principally on leases in other Harmon Meadow buildings and minimized the significance of the PQ leases.
As previously indicated, the trial court found Izenberg’s analysis to be more credible. The core issue is the probative value of the PQ’s leases. We are persuaded that there is a rational basis in the record to discount substantially the probative value of the PQ leases.
Citicorp was one of the PQ’s original tenants, leasing 50,000 square feet of space. In January 1990, Citicorp and Hartz negotiated an early termination agreement. Pursuant to that agreement, Citicorp vacated its PQ space and took 200,000 square feet in a new Hartz building on the Hudson River in Weehawken, N.J. Thus, 40% of PQ space became vacant, virtually overnight. According to Izenberg, Hartz’s management decision created a tenant-favorable market for PQ space.
According to Izenberg, Hartz’s management frequently moved tenants from one of its buildings to another of its buildings. Izenberg testified that this management idiosyncrasy made it less likely that the PQ’s actual rent was equivalent to economic rent. Izenberg also testified that an adjoining building, 450 Plaza Drive, was a “construction twin” of the PQ. Without certain management decisions made by Hartz, e.g., the Citicorp early termination in favor of a Weehawken building, the PQ’s rent would have been equivalent to No. 450.
This testimony supported the inapplicability of the “Parkview presumption,” established in Parkview Village Assoc. v. Borough of Collingswood, 62 N.J. 21, 34, 297 A.2d 842 (1972), and reiterated in Parkway Village Apartments Co. v. Township of Cranford, *481 supra, 108 N.J. at 272, 528 A.2d 922 (1987). This doctrine, originally stated as applicable to apartment houses, is also applicable to the valuation of a hotel. See Glenpointe Assoc. v. Township of Teaneck, 10 N.J.Tax 380, 391 (1989), aff'd, 12 N.J.Tax 118 (App.Div.), certif. denied, 122 N.J. 391, 585 A.2d 392 (1990). The Supreme Court explained the Parkview presumption as follows:
In the absence of convincing evidence to the contrary!,] the current ongoing income scale of a large, well-managed apartment project like this, functioning as customary with leases of relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income method of property valuation. A court or taxing agency should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent . . . . Readily to be distinguished is the case of a taxpayer owning commercial property tied to a long term lease made long before the current assessing date, where the present rent may well be out of line with current fan-rental value.
[Parkview, supra, 62 N.J. at 34-35, 297 A.2d 842.]
In Parkway Village, the Court summarized the Parkview presumption as follows:
In Parkview we presumed that the actual rent of a well-managed apartment complex is equivalent to economic rent only absent “convincing evidence to the contrary.” We explained that the municipality can overcome the Parkview presumption if it proves by “convincing evidence” that (1) the leases are not economic because the property is not well managed, (2) the leases are not economic because they are old, long term leases, or (3) the leases are not economic as shown by a comparison with at least four comparable apartment properties.
[108 N.J. at 272, 528 A.2d 922 (citations omitted).]
Assuming applicability of the Parkview presumption in an office building context, we conclude that the evidence undermined the presumption in the present case because there was evidence of Hartz’s willingness to sacrifice occupied space in the PQ in pursuit of other management objectives. The evidence, therefore, supported a determination that management had created a surplus of space in the PQ.
We are persuaded, therefore, that the findings and conclusions of the Tax Court were not arbitrary or unsupported in the evidence, particularly in light of the “Tax Court’s expertise and ability to judge credibility.” Phillips v. Township of Hamilton, supra, 15 N.J.Tax at 226.
*482 Izenberg had prepared a report two months before trial in which his value estimates differed from the estimates in his testimony and in the report he used at trial. Those initial estimates exceeded the assessed value for the years 1991 and 1992. Izenberg’s initial estimate for 1998 was Vh% less than the assessed value. His initial estimate for 1994 was approximately 6% less than the assessed value. Counsel for Mutual briefly questioned Izenberg regarding the differences between the July and September reports. The judge also questioned Izenberg about the July report and thus became aware of the difference between Izenberg’s two sets of numbers.[1]
The existence of two sets of Izenberg numbers, which Izenberg did not attempt to conceal, does not compel a favorable result for Mutual or require a new trial. The Town was not bound by its expert’s first report. Skibinski v. Smith, 206 N.J.Super. 349, 353, 502 A.2d 1154 (App.Div.1985). An expert’s inconsistent statements are appropriate for impeachment purposes and bear on the expert’s credibility. Ibid. The judge was aware of the inconsistency and exercised his power to disregard it as a factor of significance in this case. We perceive no basis in those circumstances to disturb the judgment below. See Warren Tp. v. Suffness, 225 N.J.Super. 399, 414, 542 A.2d 931 (App.Div.), certif. denied, 113 N.J. 640, 552 A.2d 166 (1988) (observing that Tax Court must apply its own judgment to valuation data submitted by experts).
Affirmed.

 It appears that the July report was marked for identification but was not introduced into evidence.