NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Patrick DeAlmeida**
**Presiding Judge**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625-0975
(609) 292-8108 Fax: (609) 984-0805

April 13, 2017

Bruce J. Stavitsky, Esq.
Stavitsky & Associates, LLC
350 Passaic Avenue
Fairfield, New Jersey 07004

Robert F. Renaud, Esq.
Palumbo, Renaud & DeAppolonio, Esq.
190 North Avenue, East
Cranford, New Jersey 07016

> Re:    Rite Aid Corporation v. Borough of Roselle
> Docket No. 004481-2009
> Docket No. 001348-2010

Dear Counsel:

This letter constitutes the court's opinion after trial in the above-referenced matters challenging the assessments on real property leased by plaintiff for tax years 2009 and 2010. For the reasons explained more fully below, the assessments are affirmed.

### I. Procedural History and Findings of Fact

The following findings of fact and conclusions of law are based on the evidence and testimony admitted at trial.

These matters concern real property in defendant Roselle Borough, Union County, owned by Roselle Equities, LLC. The property is designated in the records of the municipality as Block 7307, Lot 1.01 and is commonly known as 67 St. George Avenue. Plaintiff Rite Aid Corporation is a tenant at subject property and is responsible for paying local property taxes on the parcel.

The subject property is approximately 2.072 acres on which sits a one-story, freestanding, masonry with brick-face building constructed as a retail pharmacy. The structure has a two-lane, drive-through customer service area and 14,717 square feet of ground-floor rentable space, with a 414-square-foot storage mezzanine. Construction of the building was completed in 2005 for use as an Eckerd Pharmacy. Plaintiff acquired Eckerd Pharmacies in 2006, assumed the lease, and continued to operate a pharmacy on the property as a Rite Aid Pharmacy.

The subject property is located on a busy avenue in a neighborhood with a high concentration of retail establishments. The subject has direct access to St. George Avenue, as well as indirect access through a dedicated road to Wood Avenue, another heavily trafficked road with a concentration of commercial establishments. The property is in a commercial zone and the retail pharmacy use is consistent with zoning controls. The parcel has adequate on-site parking. There are a limited number of commercial vacancies in the vicinity of the subject property.

For tax years 2009 and 2010, the subject property was assessed as follows:

| | |
|---|---|
| Land | $ 637,700 |
| Improvement | $1,541,900 |
| Total | $2,179,600 |

The Chapter 123 average ratio for the municipality for tax year 2009 is 42.32. When the average ratio is applied to the assessment, the implied equalized value of the subject property for tax year 2009 is $5,150,284.

The Chapter 123 average ratio for the municipality for tax year 2010 is 43.22. When the average ratio is applied to the assessment, the implied equalized value of the subject property for tax year 2010 is $5,043,036.

Plaintiff filed timely Complaints in this court challenging the tax years 2009 and 2010 assessments on the subject property. The municipality did not file a Counterclaim for either tax year.

During the two-day trial, each party presented an expert real estate appraiser to offer an opinion of the true market value of the subject property on the relevant valuation dates. The opinions of the expert witnesses are summarized as follows:

| Tax Year | 2009 | 2010 |
| --- | --- | --- |
| Valuation Date | 10/1/2008 | 10/1/2009 |
| | | |
| Plaintiff's Expert Appraiser | $4,000,000 | $3,810,000[1] |
| Defendant's Expert Appraiser | $5,839,500 | $5,550,000 |

Plaintiff's expert reached his opinion of true market value after considering all three of the commonly accepted approaches to determining value: the cost approach, the income capitalization approach, and the comparable sales approach. He ultimately relied most heavily on his value conclusion under the income capitalization approach. The municipality's expert used only the income capitalization approach to formulate his opinions of true market value, offering the opinion that the other approaches to determining value were inapplicable to the subject property.

---

[1] The court notes that the report of plaintiff's expert and his original testimony reflect the opinion that the true market value of the subject property as of October 1, 2008 was $3,770,000 and as of October 1, 2009 was $3,640,000. After a number of errors in his analysis came to light during cross-examination, the expert revised his opinions of value to $4,000,000 as of October 1, 2008 and $3,810,000 as of October 1, 2009.

II. Conclusions of Law

The court's analysis begins with the well-established principle that "[o]riginal assessments . . . are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:

> The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be "definite, positive and certain in quality and quantity to overcome the presumption."

Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985)(citations omitted)).

The presumption of correctness arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote, supra, 100 N.J. at 413 (citing Powder Mill, I Assocs. v. Township of Hamilton, 3 N.J. Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222 (1988). The presumption remains "in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity." Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517 (1988).

"The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998)(citation omitted); Atlantic City v. Ace Gaming, LLC, 23 N.J. Tax 70, 98 (Tax 2006). "In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through

the close of all proofs." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence "as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). In order to overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003)(quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), certif. denied, 165 N.J. 488 (2000)), aff'd, 18 N.J. Tax 658 (App. Div. 2004).

Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982). If the court determines that sufficient evidence to overcome the presumption that the assessment is correct has not been produced, the assessment shall be affirmed and the court need not proceed to making an independent determination of value. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J. Tax 698, 703-04 (App. Div. 1996).

The court finds that plaintiff produced sufficient evidence to overcome the presumption of validity attached to the assessments. If taken as true, the opinion of plaintiff's expert and the facts upon which he relied, create a debatable question regarding the correctness of the assessment in

5

each tax year sufficient to allow the court to make an independent determination of the value of the subject property. The expert opined that on each valuation date the subject property was worth at least $1 million dollars less than the implied equalized value reflected by the assessment for that year. If taken as true, the opinion of plaintiff's expert supports a conclusion that the property has been assessed significantly in excess of its true market value.

The court's inquiry, however, does not end here. Once the presumption is overcome, the "court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co., supra, 127 N.J. at 312 (quotations omitted). "[A]lthough there may have been enough evidence to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote, supra, 100 N.J. at 413).

A.    Highest and Best Use

An essential element of the court's determination of the true market value of the subject property is a finding of the property's highest and best use. In Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015), Judge Andresini succinctly explained the legal precedents that guide this court in making a highest and best use determination:

> For property tax assessment purposes, property must be valued at its highest and best use. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 300-01, 604 A.2d 580 (1992). "Any parcel of land should be examined for all possible uses and that use which will yield the highest return should be selected." Inmar Associates, Inc. v. Township of Edison, 2 N.J. Tax 59, 64 (Tax 1980). Accordingly, the first step in the valuation process is the determination of the highest and best use for the subject property. American Cyanamid Co. v. Township of Wayne, 17 N.J. Tax 542, 550 (Tax 1998), aff'd,

19 N.J. Tax 46 (App. Div. 2000). "The concept of highest and best use is not only fundamental to valuation but is a crucial determination of market value. This is why it is the first and most important step in the valuation process." Ford Motor Co. v. Township of Edison, 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b. per curiam, 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290, 604 A.2d 580 (1992); see also Gen. Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005).

The definition of highest and best use contained in The Appraisal of Real Estate, a text frequently used by this court as a source of basic appraisal principles, has remained relatively constant for all of the years under appeal. Highest and best use is defined as:

> The reasonably probable and legal use of vacant land or improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value.
>
> [Appraisal Institute, The Appraisal of Real Estate, 22 (13th ed. 2008).]

The highest and best use analysis requires sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive. Ford Motor Co., supra, 10 N.J. Tax at 161; see also The Appraisal of Real Estate at 279. Implicit in this analysis is the assumption that the proposed use is market-driven; in other words, that it is determined in a value-in-exchange context and that there is a market for such use. WCI-Westinghouse v. Township of Edison, 7 N.J. Tax 610, 616-17 (Tax 1985), aff'd o.b. per curiam, 9 N.J. Tax 86 (App. Div. 1986). A highest and best use determination is not based on value-in-use because the determination is a function of property use and not a function of a particular owner's use or subjective judgment as to how a property should be used. See Entenmann's Inc. v. Borough of Totowa, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use of an improved property is the "use that maximizes an investment property's value, consistent with the rate of return and associated risk." Ford Motor Co., supra, 127 N.J. at 301, 604 A.2d 580. Further, the "actual use is a strong consideration" in the analysis. Ford Motor Co., supra, 10 N.J. Tax at 167.

Highest and best use is not determined through subjective analysis by the property owner. The Appraisal of Real Estate at 279. The

proper highest and best use requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses. See Cherry Hill, Inc. v. Township of Cherry Hill, 7 N.J. Tax 120, 131 (Tax 1984), aff'd, 8 N.J. Tax 334 (App. Div. 1986). Additionally, the proposed use must not be remote, speculative, or conjectural. Id. If a party seeks to demonstrate that a property's highest and best use is other than its current use, it is incumbent upon that party to establish that proposition by a fair preponderance of the evidence. Penn's Grove Gardens, Ltd v. Borough of Penns Grove, 18 N.J. Tax 253, 263 (Tax 1999); Ford Motor Corp., supra, 10 N.J. Tax at 167. Property should be assessed in the condition in which it is utilized and the burden is on the person claiming otherwise to establish differently. Highview Estates v. Borough of Englewood Cliffs, 6 N.J. Tax 194, 200 (Tax 1983).

Although there was a suggestion during trial that the parties' expert witnesses offered differing views on the subject property's highest and best use, a close examination of the trial reveals that the experts agree that the highest and best use of the subject property is for rental to a retail establishment. The court accepts this highest and best use as credible.

Where the experts differ is the type of leases that provide the most credible evidence of market rent for the subject property. Plaintiff's expert offered the opinion that leases executed in connection with the construction of pharmacies are not credible evidence of market rent. He relies instead on leases of generic retail space and retail space rented to pharmacies in structures not built to suit for the pharmacy tenants. Defendant's expert, on the other hand, relies solely on leases to national retail pharmacies. The court will address market rent later in this opinion.

A.    Approach to Valuation

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div.)(citing Appraisal Institute, The Appraisal of Real Estate 81 (11th

8

ed 2006)), certif. denied, 168 N.J. 291 (2001). "There is no single determinative approach to the valuation of real property." 125 Monitor Street, LLC v. City of Jersey City, 21 N.J. Tax 232, 237 (Tax 2004)(citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965); ITT Continental Baking Co. v. Township of East Brunswick, 1 N.J. Tax 244 (Tax 1980)), aff'd, 23 N.J. Tax 9 (App. Div. 2005). "The choice of the predominate approach will depend upon the facts of each case and the reaction of the experts to those facts." Id. at 238 (citing City of New Brunswick v. Division of Tax Appeals, 39 N.J. 537 (1963); Pennwalt Corp. v. Township of Holmdel, 4 N.J. Tax 51, 61 (Tax 1982)).

The income capitalization approach is the preferred method of estimating the value of income producing property. Parkway Village Apartments Co. v. Township of Cranford, 108 N.J. 266, 270 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value." Appraisal Institute, The Appraisal of Real Estate 445 (13th ed 2008). The court finds that the income capitalization approach is the best method for determining the value of the subject property, an income-producing building suited for use as a retail space. Both experts used this approach in formulating their opinions of value. Plaintiff's expert relied most heavily on this approach among the three approaches that he used and defendant's expert relied only on this approach.

The court rejects the opinions of value offered by plaintiff's expert under the cost approach and the sales comparison approach. The expert's cost approach analysis suffered from a number of flaws that undermined the credibility of his opinion. As a preliminary consideration, "[t]he cost approach is normally relied on to value special purpose property or unique structures for which there is no market." Borough of Little Ferry v. Vecchiotti, 7 N.J. Tax 389, 407 (Tax 1985);

Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445, 452 (Tax 1980), aff'd, 180 N.J. Super. 366 (App. Div.), certif. denied, 88 N.J. 495 (1981). There is no credible evidence in the record that the subject property fits into this category. The structure is suited for use as a retail space.

Second, plaintiff's expert did not accurately calculate the cost of constructing the subject property. The cost approach "involves a replication, through the use of widely accepted cost services . . . of the cost of the components of the building to be valued, less . . . depreciation[s]." Gale & Kitson Fredon Golf, LLC v. Township of Fredon, 26 N.J. Tax 268, 283 (Tax 2011)(quotations omitted). "A cost approach has two elements – land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors & Fragrances, Inc. v. Borough of Union Beach, 21 N.J. Tax 403, 417 (Tax 2004). Here, the expert failed to include in his calculations the costs associated with constructing the two-lane, drive-through component of the subject property. He admitted, however, that the drive-through lanes are an integral part of the structure, particularly for pharmacy tenants, but valuable to other retail tenants. It is clear to the court that this important feature of the building should have been included in the cost analysis. In addition, the expert failed to include the cost of constructing the mezzanine inside the subject property, as well as the site improvements, and used an incorrect height for the structure. The height of a building is an essential component of cost. Additionally, the expert used an incorrect year of construction for the subject property. Age is an important factor in the cost approach. Construction costs must be calculated from the year of construction and trended to the relevant valuation dates. In addition, depreciation is measured in large part by a structure's age.

Finally, the comparable land sales used by the expert to reach an opinion of value under the cost approach were unpersuasive. One of the comparable land sales was of property not zoned for retail uses. Other comparable land sales were associated with a bankruptcy or other distressed

situations not investigated by the expert. Also, the expert opined that several of the comparable land sales were sold with development approvals in place. He admitted on cross-examination, however, that he was not sure that development approvals were in place for one of the sales and could not identify with certainty any of his comparable land sales in which development approvals had been obtained at the time of the sale. These are crucial admissions, given that an adjustment to the sales prices would certainly have been warranted had the purchase been made contingent on securing development approvals.

With respect to the comparable sales approach, the court concludes that the sales on which plaintiff's expert relied lack credibility as evidence of value of the subject property. Many of the comparable sales are not representative of the subject, as they concern generic retail properties lacking in the features and amenities that significantly contribute to the value of the subject property. For example, the expert's comparable sale No. 3 is of a former industrial building converted to retail use. The expert did not provide a date of construction of the structure or the date of its conversion. In addition, it is readily apparent from a photograph in the record, that the building, which has no windows, no drive-through lanes, and no distinguishing exterior characteristics, is entirely dissimilar to the relatively new retail pharmacy that is the subject of this appeal. Similarly, the expert's comparable sale No. 4 is of a masonry commercial building of unspecified age with limited on-site parking, no drive-through lanes, and two garage bays, apparently appropriate for car repair services. Again, this structure is dissimilar to the subject. The structures associated with the expert's comparable sale No. 1 were demolished shortly after the sale to make way for the construction of a new building, strongly suggesting that the sale price reflects only land value. The expert's comparable sale No. 5, which he admitted is "not highly representative of the subject," is of a building constructed in 1955 and in average condition.

11

Importantly, plaintiff's expert did not make adjustments to the comparable sales to account for the fact that a number of the transactions involved properties with leases in place. The sales prices on these transactions likely represent not true market value, but leased fee value. That is, the parties to the transfer real property with a long-term lease in place are likely to arrive at purchase price that reflects the present day value of the income stream resulting from the lease. An existing lease might be at, below, or above, market rent. A purchase price determined based on the income generated by an existing lease, therefore, might not accurately reflect market value, which is the foundation of a local property tax assessment. Because the sale of a leased fee interest will not necessarily reflect market value "when analyzing a lease fee interest, it is essential that the appraiser analyze all of the economic benefits or disadvantages created by the lease." International Flavors & Fragrances, supra, 21 N.J. Tax at 423 (quotations omitted).

B.      Calculation of Value Using Income Approach

Determining the value of real property pursuant to the income approach can be summarized as follows:

                    Market Rent
            x       Square Footage
                    Potential Gross Income

            -       Vacancy and Collection Losses
                    Effective Gross Income

            -       Operating Expenses
                    Net Operating Income

            ÷       Capitalization Rate
                    Value of Property

See Spiegel v. Town of Harrison, 19 N.J. Tax 291, 295 (App. Div. 2001), aff'g, 18 N.J. Tax 416 (Tax 1999); Appraisal Institute, The Appraisal of Real Estate 466 (13th ed 2008).

1.      <u>Market Rent</u>

"Central to an income analysis is the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" <u>Parkway Village Apartments</u>, <u>supra</u>, 108 <u>N.J.</u> at 270.  This differs from the actual rental income realized on the property, which may be below market rates. <u>Parkview Village Assocs. v. Borough of Collingswood</u>, 62 <u>N.J.</u> 21, 29-30 (1972).  However, actual income is a significant probative factor in the inquiry as to economic income.  <u>Id.</u> at 30.  "Checking actual income to determine whether it reflects economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitive area."  <u>Ibid.</u>

Plaintiff's expert identified six leases he considered to be reflective of market rent for the subject.  Notably, the expert did not consider the lease in place at the subject, which became effective in 2005, three years prior to the first valuation date.  In general, a transaction relating to the subject property near in time to the valuation date is excellent evidence of market value.  The expert opined that the subject lease was not reliable because it is a long-term lease with a national tenant that likely has excellent credit.  In addition, the expert disregarded the lease because the prior tenant made "a business decision" to locate a pharmacy on the subject property and arranged for a built-to-suit structure to be constructed by the property owner.  The expert speculated that the original tenant, when agreeing to a rental rate for the subject, was not concerned with obtaining market rent but was motivated by a desire to enter the local retail pharmacy market.  In addition, the expert speculated that the rental rate might include a return on the cost of construction of the building.  The court is not convinced by the expert's testimony.

The court accepts the proposition that a lease related to a built-to-suit structure might not reflect market rent.  It is possible that the rental rate in such a lease might reflect both market rent

for the structure and a partial or full repayment of the cost of constructing the building. In addition, it may be true that a particular tenant is willing to pay above market rents in order to enter a particular retail market. To reach such conclusions, however, it would be necessary for the court to evaluate evidence concerning the circumstances of the transaction that resulted in the lease, the intentions of the parties when executing the lease, and market rent for properties similar to the subject. Plaintiff's expert did not provide any such evidence. He was unfamiliar with the details of the formation of the lease at the subject property, and appears to have based his decision to disregard the subject lease on his supposition that all built-to-suit leases of pharmacies do not reflect market rent. In the absence of any evidence supporting his supposition, the expert's decision to disregard the subject lease undermines the credibility of his opinion of market rent.

Of the six comparable leases on which plaintiff's expert relied, only two are leases of pharmacies, neither of which is in Union County. One is a lease of a Rite Aid pharmacy in Bergen County. This pharmacy is not a free-standing building and does not have drive-through lanes. It is instead a space within a strip mall constructed in 1958 and updated "recently." The ten-year lease began in 2006 with two optional five-year renewal periods. The expert reported an "initial" rent of $28.00 per square foot, which he adjusted downward to $25.93 per square foot after considering five months of free rent given to the tenant. Although the expert admitted that the lease includes subsequent "step ups" in rent after the "initial" rent, he did not know what the "step p" rents are or when they took effect. The expert conceded that he did not review the actual lease, but only a lease summary, even though Rite Aid, the tenant at the property is the plaintiff, and his client, in this case.

The other pharmacy lease on which plaintiff's expert relied was of a building in Bergen County. This also is not a free-standing building, although it has a drive-through area. It was plain

14

during cross-examination that the expert had not verified this lease and was unfamiliar with its terms. He did not know if the lease was a renewal and could not identify the tenant with certainty.

The other four leases on which he relied are of generic retail space. The expert offered the opinion that the subject property was, in effect, a plain "vanilla" space that could be leased to any retail entity. He testified that he was aware of two instances in which space previously occupied by pharmacies was leased to non-pharmacy retailers. While the court finds credible the notion that space leased to a pharmacy might subsequently be leased to a non-pharmacy retailer, plaintiff's expert provided no credible evidence that the relatively new structure at the subject property was likely to be leased to the non-pharmacy tenant. Nor did the expert produce credible evidence of market rent to a non-pharmacy tenant in a structure with the characteristics of the subject, including drive-through access.

For example, one comparable lease upon which plaintiff's expert relied is related to a 4,000-square-foot space in a strip mall in Elizabeth. The expert could not identify the tenant or whether there was adequate parking for the tenant's use of the space. This location does not have a drive-through facility. Two other comparable leases are of retail spaces in strip malls, with no drive-through access. The expert was not aware that the remaining comparable lease was executed when the owner of a large shopping complex had a business need to relocate an existing tenant to accommodate the construction of a big box retailer on the site. This unusual motivation on the part of the property owner was not considered by the expert when analyzing whether the lease reflects market rent.

Defendant's expert offered the more credible opinion of market rent. He relied on six comparable leases, all of pharmacies. The expert's first comparable lease is lease of the subject.

15

Averaging the rent step ups on the lease, the expert determined that the lease of the subject provided a rent of $31.56 per square foot.

The expert also relied on leases of freestanding pharmacy buildings Roselle Borough (the same municipality as the subject), Springfield Township (Union County), Roseland Borough (Essex County), and West Caldwell Township (Essex County). All but one of those structures has drive-through access. In addition, the expert relied on the lease of a space in a mixed-use complex in Summit City (Union County). Although this space has no drive-through area, the expert offered the opinion that a drive-through is not necessary at this location because the intended market is for tenants of the mixed-use building, who would not need the drive-through facility to avoid exiting their vehicles in bad weather, to accommodate elderly customers, or to protect children in a parking lot (the three primary purposes of drive-through access, according to the expert).

Prior to adjustments the comparable leases had rental rates ranging from $29.68 per square foot to $37.59 per square foot. The expert made time adjustments for changes in the market, resulting in adjusted rental rates ranging from $32.05 per square foot to $37.59 per square foot. The court finds the adjustments made by defendant's expert to be credible. The court will, however, disregard the adjusted rental rates from comparable lease No. 3 and comparable lease No. 6, the two pharmacies with no drive-through access. Also, comparable lease No. 6 is disregarded because the property is not a free-standing building and is in a mixed-use facility, two factors that render the lease less credible as evidence of market rent for the subject.

The remaining leases have adjusted rental rates per square foot of

$33.53
$34.08  (subject)
$37.21
$37.41

16

Defendant's expert opined a market rent of $34.00 per square foot for tax year 2009. This is quite close the rent reflected in the lease on the subject property. The court finds the expert's opinion credible in light of the adjusted rents accepted by the court. The expert adjusted the rent upward by 2% for tax year 2010 for time and market conditions. That court finds this to be a credible adjustment and adopts a market rent of $34.70 for tax year 2010.

2.    Building Size

The experts offered differing views with respect to the size of the subject property. The trial testimony credible establishes that plaintiff's expert did not measure the subject property and that his client did not give him access to inspect the property. He instead examined the property from the public areas, having entered the store during business hours as any member of the shopping public might do. Plaintiff's expert did not examine site plans or architectural drawings of the building when determining the rentable area of the structure.

Defendant's expert, on the other hand, inspected the property and measured the building. The court finds that, in light of his more detailed examination and measurement of the property, defendant's expert offered the more credible opinion of 14,717 square feet of rentable space.

3.    Vacancy and Collection Rate

Plaintiff's expert utilized a 7% vacancy and collection rate, with 5% for vacancy and 2% for collection loss. He opined that this is a stabilized rate for the subject property, even though there was a lower vacancy in the generic retail market of 6.6% in northern New Jersey.

Defendant's expert relied on data from what he described as the "niche" pharmacy market to opine a vacancy and collection loss rate of 3%. He based his opinion, in part, on the fact that national pharmacy tenants, such as plaintiff, and the tenants in the comparable leases, are excellent credit tenants, highly likely to pay rent, sometimes even after a built-to-suit building is vacated as

17

a pharmacy to prevent its lease to a competitor. The court concludes that the vacancy and collection rate opined by defendant's expert is more credible.

4.      Operating Expenses

Plaintiff's expert opined an overall expense rate of 10% of effective gross income per year. He concluded that management and real estate commissions would account for 7% of effective gross income, miscellaneous expenses would be $6,000 per year, and structural repairs would amount to $0.25 per square foot per of rentable space year. He did not explain the market data upon which he relied to reach these opinions.

Defendant's expert opined an overall expense rate of 7% of effective gross income. He opined a management expense of 3% per year, opining that in triple-net leases, upon which he relied, the landlord's responsibilities are limited to collecting rent and inspecting the premises to ensure proper maintenance. He further opined that built-to-suit leases rarely incur real estate commissions, as tenants tend to stay in place. He opined an expense 3% for real estate commissions to account for the possibility that the property would be marketed to a second-generation pharmacy. Last, defendant's expert assigned an expense rate of 1% for reserves. The court finds defendant's expert opinion regarding operating expenses to be more credible.

5.      Capitalization Rate

The capitalization rate is an "income rate for a total real property interest that reflects the relationship between a single year's net operating income expectancy and the total property price or value . . . ." Appraisal Institute, The Appraisal of Real Estate at 462. The overall capitalization rate is "used to convert net operating income into an indication of overall property value." Ibid.

Both experts used the Band of Investment technique to calculate an overall capitalization rate. "This technique is a form of 'direct capitalization' which is used 'to convert a single year's

income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding, supra, 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, Appraisal of Real Estate 467 (10th ed 1992)).

> Because most properties are purchased with debt and equity capital, the overall capitalization rate must satisfy the market return requirements of both investment positions. Lenders must anticipate receiving a competitive interest rate commensurate with the perceived risk of the investment or they will not make funds available. Lenders generally require that the loan principal be repaid through periodic amortization payments. Similarly, equity investors must anticipate receiving a competitive equity cash return commensurate with the perceived risk, or they will invest their funds elsewhere.
>
> [Appraisal Institute, Appraisal of Real Estate 505 (13th ed 2008).]

In "using the Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Hull Junction Holding, supra, 16 N.J. Tax at 82 (quoting Glen Wall Assocs., supra, 99 N.J. at 279-80). "For these purposes, the Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Id. at 82-83. "Relevant data is also collected and published by . . . Korpacz Real Estate Investor Survey." Id. at 83. "By analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.

Plaintiff's expert opined a capitalization rate of 8.65% for tax year 2009. This figure is based on a 65% to 35% loan-to-value ratio, a 25-year mortgage with a 6.25% interest rate, with a mortgage constant of 5.15%, and a 10.0% equity return. For tax year 2010, plaintiff's expert

19

opined a capitalization rate of 8.42%, based on a 65% to 35% loan-to-value ratio, a 25-year mortgage with a 6.5% interest rate, a mortgage constant of 8.1%, and 9% equity return.

Defendant's expert opined a capitalization rate of 7.73% for tax year 2009. This figure was based on a 70% to 30% loan-to-value ratio, a 25-year mortgage with a 7.0% interest rate, with a mortgage constant of 8.48%, and a 6.0% equity return. For tax year 2010, defendant's expert opined a capitalization rate of 8.3%, based on a 70% to 30% loan-to-value ratio, a 25-year mortgage with a 7.5% interest rate, a mortgage constant of 8.87%, and 7% equity return.

Based on the data submitted by both experts, the court finds that the figures offered by defendant's expert are well supported by the record and commensurate with the rate of risk of investment that is likely to attract investors to the subject property. Thus, the court will apply a 7.73% capitalization rate for tax year 2009 and an 8.3% capitalization rate for tax year 2010.

6.      Calculation of Value

Given that the court accepts as credible each component of the analysis of defendant's expert, the court also accepts the expert's value conclusions:

For tax year 2009, the true market value of the subject property as of October 1, 2008 was $5,839,500.

For tax year 2010. The true market value of the subject property as of October 1, 2009 was $5,550,000.

C.      Applying Chapter 123

Pursuant to N.J.S.A. 54:51A-6a, commonly known as Chapter 123, in a non-revaluation year, an assessment must be adjusted when the ratio of the assessed value of the property to its true value exceeds the upper limit or falls below the lower limit of common level range. The

20

common level range is defined by <u>N.J.S.A.</u> 54:1-35a(b) as "that range which is plus or minus 15% of the average ratio" for the municipality in which the subject property is located.

The true values determined above must, therefore, be compared to the average ratio for Roselle Borough for each of the relevant tax years. The formula for determining the subject property's ratio is:

Assessment ÷ True Value = Ratio

1.    <u>Tax Year 2009</u>

$2,179,600 ÷ $5,839,500 = .3733

The Chapter 123 average ratio for Roselle Borough for tax year 2009 is .4232 with an upper limit of .4867 and a lower limit of .3597. The ratio for the subject property for this tax year is .3733, which is within the common level range. No adjustment is warranted. The court will enter Judgment affirming the assessment for tax year 2009.

2.    <u>Tax Year 2010</u>

$2,179,600 ÷ $5,550,000 = .3927

The Chapter 123 average ratio for Roselle Borough for tax year 2010 is .4322 with an upper limit of .4970 and a lower limit of .3674. The ratio for the subject property for this tax year is .3927, which is within the common level range. No adjustment is warranted. The court will enter Judgment affirming the assessment for tax year 2010.

Very truly yours,

/s/ Hon. Patrick DeAlmeida, P.J.T.C.