**TAX COURT OF NEW JERSEY**



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL**
**OF THE TAX COURT COMMITTEE ON OPINIONS**

May 25, 2022

Michael I. Schneck, Esq.
Schneck Law Group, LLC
301 South Livingston Avenue, Suite 105
Livingston, New Jersey 07039

Joseph V. Sordillo, Esq.
DiFrancesco, Bateman, Kunzman, Davis, Lehrer & Flaum, P.C.
15 Mountain Boulevard
Warren, New Jersey 07059

> Re: <u>836 Bloomfield Ave Associates, LLC v. Montclair Township</u>
> Docket Nos. 007704-2018, 001781-2019, 001473-2020, and 001213-2021

Dear Mr. Schneck and Mr. Sordillo:

This letter shall constitute the court's opinion following trial of local property tax appeals instituted by plaintiff, 836 Bloomfield Ave Associates, LLC ("plaintiff"). Plaintiff challenges the 2018, 2019, 2020, and 2021 local property tax assessments on its improved property located in Montclair Township ("Montclair").

For the reasons stated more fully below, the court affirms the 2018, 2019, 2020, and 2021 tax year local property tax assessments.

## I. <u>Findings of Fact</u>

Pursuant to <u>R.</u> 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony presented during trial.

Plaintiff is the owner of the real property and improvements located 836-838 Bloomfield Avenue, Montclair, Essex County, New Jersey (the "subject property"). The subject property is identified on Montclair's municipal tax map as Block 402, Lot 6. The subject property is located






on the corner of Bloomfield Avenue and Rockledge Road, near Montclair's western boundary with Verona Borough. As of the valuation dates at issue, the site comprised an approximate 0.27-acre, rectangular shaped parcel with 130 feet of frontage along Bloomfield Avenue and 91 feet of frontage along Rockledge Road.[1]

Plaintiff filed direct appeals with the Tax Court challenging the subject property's 2018, 2019, 2020, and 2021 tax year local property tax assessments. Montclair filed counterclaims for the 2019, 2020, and 2021 tax years.

As of the valuation dates at issue, the subject property was improved with a "U-shaped" three-story, brick, walk-up apartment building constructed in 1926. Due to the lot's upwards slope from Bloomfield Avenue, the elevation of the building's entrance is several feet higher than Bloomfield Avenue. Accordingly, to access the property from Bloomfield Avenue, individuals must climb a flight of approximately twelve steps to gain access to the building's front entrance.[2] As a result of the site's topography, the front portion of the subject property's basement is located above grade-level, and the rear portion is substantially below grade-level. The building is comprised of nineteen (19) individual residential units, consisting of nine (9) one-bedroom apartments and ten (10) two-bedroom apartments.[3] The building contains six apartments per floor, with a two-bedroom apartment occupied by the building's superintendent located in the basement. The building offers no on-site parking; therefore, tenants must resort to street parking or make private parking arrangements. The building's common areas include n front entry with ceramic

---

[1] Plaintiff's expert opined that the subject property's lot comprises 0.2715-acres, and Montclair's expert opined that it comprises 0.2676-acres.
[2] The subject property also contains a grade-level concrete walkway from Rockledge Road, apparently leading to the building's front entrance.
[3] Plaintiff's expert opined that the subject property is an eighteen (18) residential unit building.






tile flooring, commercial grade wall-to-wall carpeting, plaster ceilings and walls, and a steel interior stairway. The basement contains two coin-operated clothes washing machines and dryers. Plaintiff is responsible for supplying heat and hot water to the apartments and common areas. However, the apartments are separately metered for their own electric usage and gas cooking, and air conditioning is provided through window units.

The court's review of the experts' photographs and trial testimony reveals that the subject property is in average condition. Although only a limited sampling was offered (one apartment unit), the court's review of the experts' photographs discloses that the unit's kitchen and bathroom are dated. The kitchen is finished with a drop ceiling and furnished only with basic amenities (wood and melamine cabinets, refrigerator, oven, and sink).[4] Moreover, the subject property's common area hallway finishes, including the door buzzer and mailboxes, are dated.

The subject property is in Montclair's R4 – Three Story Apartment District. The use of the property as an apartment complex is legally permitted but predates adoption of the zoning ordinance. However, the subject property does not comply with several bulk requirements and, thus, is viewed as a legally permitted, pre-existing, non-conforming use. The property is in Flood Hazard Zone X, denoting an area of minimal flooding risk.

Plaintiff acquired the subject property on April 5, 2005, for reported consideration of $1,650,000.

During trial plaintiff and Montclair each offered testimony from State of New Jersey certified general real estate appraisers, who were accepted by the court, without objection, as experts in the property valuation field (referred to herein as "plaintiff's expert," "Montclair's

---

[4] Montclair's expert testified that the superintendent advised him that the residential unit inspected was "representative of all the units within the complex."






expert," or collectively the "experts"). Each expert prepared an appraisal report expressing opinions of the subject property's true or fair market value as of the October 1, 2017, October 1, 2018, October 1, 2019, and October 1, 2020 valuation dates.

The subject property's local property tax assessments, implied equalized values, and the experts' value conclusions, as of each valuation date, are set forth below:

| Valuation dates | Local property tax assessment | Average ratio of assessed to true value | Implied equalized value | Plaintiff's expert's concluded value | Montclair's expert's concluded value |
|---|---|---|---|---|---|
| 10/1/2017 | $1,966,900 | 100% | $1,966,900 | $1,490,000 | $2,185,000 |
| 10/1/2018 | $1,966,900 | 90.23% | $2,179,874 | $1,540,000 | $2,275,000 |
| 10/1/2019 | $1,966,900 | 89.51% | $2,197,408 | $1,570,000 | $2,400,000 |
| 10/1/2020 | $1,966,900 | 88.05% | $2,233,844 | $1,530,000 | $2,515,000 |

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the proofs of the party challenging the local property tax assessment, the court must be presented with evidence that raises a "debatable question as to the validity of the






assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

Here, at the close of plaintiff's proofs, Montclair moved to dismiss these matters, under R. 4:37-2(b), arguing that plaintiff failed to overcome the presumption of validity. Affording plaintiff all reasonable and legitimate inferences which could be deduced from the evidence presented, the court concluded that plaintiff produced cogent evidence sufficient to overcome the presumption of validity. See MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The opinions of plaintiff's expert, if accepted as true, raised debatable questions as to the validity of the subject property's local property tax assessments. Accordingly, the court denied Montclair's motion and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that the local property tax assessments are erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the [party challenging the tax assessment] . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

B. Highest and Best Use

"For local property tax purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The determination of the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The



ADA
Americans with
Disabilities Act

ENSURING
AN OPEN DOOR TO
JUSTICE


highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Here, after considering all legally permitted, physically possible, financially feasible, and maximally productive uses, both experts concluded that the subject property's highest and best use, as vacant, is for development with a multi-family residence. Similarly, both experts concluded that the subject property's highest and best use, as improved, is its existing use as an apartment complex. The court finds the experts' highest and best use conclusions are reasonable and credibly supported by their analysis of Montclair's R-4 zoning ordinance and market forces.

C.    Valuation

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); see also ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963)); see also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610, 619 (Tax 1985).

   

When a property is income producing, the income capitalization approach is the "preferred method for estimating the value of income producing property." Forsgate Ventures IX, LLC v. Twp. of South Hackensack, 29 N.J. Tax 28, 46 (Tax 2016), aff'd, 31 N.J. Tax 135 (App. Div. 2018). See Parkway Vill. Apartments Co. v. Cranford Twp., 108 N.J. 266, 269 (1987) (concluding that "[t]he income method is generally preferred for assessing income-producing property"); TD Bank v. City of Hackensack, 28 N.J. Tax 363, 378 (Tax 2015); Shav Associates v. Middletown Twp., 11 N.J. Tax 569, 578 (Tax 1991).

Here, because the subject property is an income-producing apartment complex, both experts concluded that the income capitalization approach was the most suitable method to derive an estimate of the subject property's true or market value. Accordingly, as did the experts, the court concludes that the income capitalization approach is the most appropriate method to determine the subject property's true or market value.

However, despite concurring that the income capitalization approach was the most appropriate method for determining the subject property's true or market value, the experts disagreed on how the subject property's potential gross income should be calculated, resulting in their disparate value conclusions. Accordingly, the court's analysis begins with an analysis and discussion regarding how each expert calculated the subject property's potential gross income.[5]

---

[5] The court highlights that in performing the income capitalization approach, both experts applied a five (5%) vacancy and collection loss factor and added certain additional revenue source income to the gross rental income. In addition, the experts deducted similar stabilized expenses for management, administrative/legal expenses, utility charges (including water and sewer), maintenance and repairs, insurance, and replacement reserves, to discern a reconstructed net operating income. Moreover, both experts employed the Band of Investment technique, relying on published surveys and market data, in arriving at similar base capitalization rates, as of each tax year under appeal. Finally, both experts "loaded" their capitalization rates by applying Montclair's effective tax rate for each year under appeal to their base capitalization rates.






      1.    <u>Potential gross income</u>

According to plaintiff's expert, his appraisal process included conducting an interview of the subject property's property manager/owner. During that interview, he discovered that plaintiff's principal is actively engaged in property management, managing approximately 935 residential units in New Jersey. In evaluating the subject property's management, plaintiff's expert offered that he compared the subject property to the hundreds of apartment buildings he has appraised during his career, in addition to the properties that he currently manages. His investigation further disclosed that plaintiff has a full-time management staff, including an accounting department. In plaintiff's expert's opinion, the property manager/owner is experienced in apartment complex management and seeks to "maximize the rent at the subject property" by listing vacant units for rent on the Garden State Multiple Listing Service and/or Apartments.com. Therefore, he concluded that, "this property is prudently and competently managed."[6]

Importantly, plaintiff's expert testified that he inspected the subject property and determined that it "contains eighteen [18] residential apartments." Plaintiff's expert opined that the subject property is composed of nine (9) one-bedroom units and nine (9) two-bedroom units. Although plaintiff's expert report states that he determined the subject property's "[p]otential gross income . . . by analyzing the leases of similar properties," his trial testimony disclosed that this statement was erroneous and that he did not examine other market leases. Rather, to determine the subject property's potential gross income, he "reviewed. . . information . . . received from the property owner in preparation of [his] appraisal report," which he identified as plaintiff's Certified

---

[6] According to plaintiff's expert, <u>The Appraisal of Real Estate</u> defines "prudently and competently managed" as, "an owner/operator/management company that maintains and uses real estate in a manner consistent with the manner to which typical buyers of similar properties would consider appropriate as measured by actual practices in the competitive market."






Answers to Standard Interrogatories for the 2018 and 2019 tax years ("P-2"), and for the 2020 and 2021 tax years ("P-3").[7]

According to plaintiff's expert, he used P-2 and P-3 to assemble the rent roll table contained in his appraisal report identifying the monthly rents charged (in columnar form) during the prior tax year for each of the eighteen (18) residential units he identified.[8] Plaintiff's expert added the rents under each column to compute a monthly total and multiplied the monthly total by twelve (representing the number of months in a year), to calculate the subject property's gross rental income or potential gross income. According to plaintiff's expert, "I utilized their [the subject property's] actual leases as the potential gross income."[9]

Notably, only plaintiff's September 2, 2020 Rent Roll and December 30, 2020 Rent Roll identified unit 836C6 as being occupied by an "employee," which plaintiff's expert assumed was the building's superintendent. Thus, for the 2020 tax year, plaintiff's expert ascribed no rent to unit 836C6.

Similarly, Montclair's expert inspected the subject property and reviewed P-2 and P-3. However, Montclair's expert's review of the Certified Answers to Standard Interrogatories disclosed that the responses state the subject property consists of "[n]ineteen (19) residential units." Additionally, Montclair's expert credibly testified that during his inspection, the "resident

---

[7] Plaintiff's expert testified that he reviewed P-2 and P-3, including the rent rolls for the 2016, 2017, 2018, 2019 tax years, and two (2) for the 2020 tax year. However, the court observes that P-2 and P-3 do not contain copies of the 2016, 2017, 2018, and 2019 rent rolls.

[8] According to plaintiff's expert, the 2017 rent roll was not included in P-2 or P-3 but was subsequently provided to Montclair.

[9] Plaintiff's expert then applied a vacancy and collection loss factor of five (5%) percent to his gross potential income figures and then added the received and reported annual "laundry income" each year to compute his effective gross income. However, plaintiff's expert did not include in his potential gross income calculation the annual "pet income" or "late charges" received and reported by plaintiff on their income statements.









superintendent, Paul," who accompanied Montclair's expert, revealed that he resides in the basement apartment unit.[10] Moreover, during or immediately following Montclair's expert's inspection, he asked "Paul" why the September 2, 2020 and December 30, 2020 rent rolls identified apartment unit 836C6 as "employee," however, Paul could not offer any explanation, as he stated that he was the building's superintendent during those periods.

During trial, Montclair's expert expressed that he "requested numerous times" more comprehensive rent rolls and income and expense statements for the subject property, but he was only furnished with the following rent rolls: (i) January 2016; (ii) August 2018; (iii) September 2, 2020; and (iv) December 30, 2020. In addition, Montclair's expert testified that he was subsequently provided with a document containing the handwritten note "2017 RR," however, according to Montclair's expert, "the entire document . . . was not legible, and it was in a different format than any of the other documents that had been provided, [so] I looked at it with skepticism."[11]

Because of the discrepancy in the number of apartment units reflected on the rent rolls (18 residential units) and the number of apartment units reflected in plaintiff's discovery responses (19 residential units), Montclair's expert regarded the rent rolls as "suspect." Accordingly, due to what he characterized as "the absence of complete and accurate rent roll information" and the presence of long-term tenants in the building, Montclair's expert rejected the subject property's actual

---

[10] According to Montclair's expert, during his inspection, the "resident superintendent, Paul," stated that the subject property was comprised of twenty individual residential units. Following his inspection, Montclair's expert reviewed the property record card back at his office and telephoned Paul to obtain clarity on this issue. Paul apparently advised Montclair's expert that he misspoke and that the subject property is comprised of nineteen individual residential units.

[11] Copies of the January 2016 "Tenant Listing," August 2018 "Tenant Listing," September 2, 2020 "Rent Roll," December 30, 2020 "Rent Roll" and "2017 RR" were contained in the Addenda to Montclair's expert's appraisal report.






rentals.

In Montclair's expert's opinion, "we are doing a market value appraisal here, and if I determined that the rents they were getting are not market, I am obliged to actually go to the markets see what the rents should be, especially in a non-rent controlled community." Thus, Montclair's expert testified that he examined economic or market rents for one-bedroom and two-bedroom units of twelve (12) other apartment complexes in Montclair. Based on his analysis, Montclair's expert concluded that the market rent for the subject property's one-bedroom units should be: (i) $1,300, for the 2018 tax year; (ii) $1,350, for the 2019 tax year; (iii) $1,400, for the 2020 tax year; and (iv) $1,450, for the 2021 tax year. In addition, he determined that the market rent for the subject property's two-bedroom units should be: (i) $1,700, for the 2018 tax year; (ii) $1,750, for the 2019 tax year; (iii) $1,800, for the 2020 tax year; and (iv) $1,850, for the 2021 tax year. Montclair's expert then multiplied each of his concluded one-bedroom apartment market rent and his two-bedroom apartment market rent by nine (9) units to calculate a stabilized annual rental income.[12]

The following chart details the potential gross income differences calculated by each expert:

| Tax year | Plaintiff's expert's PGI | Montclair's expert's stabilized PGI |
|---|---|---|
| 2018 | $250,920 | $325,728 |
| 2019 | $256,980 | $338,558 |
| 2020 | $259,632 | $350,248 |
| 2021 | $253,488 | $351,679 |

---

[12] Montclair's expert then added plaintiff's reported annual laundry income, "late fees," and miscellaneous income, including "pet income," to his stabilized annual rental income to calculate the subject property's potential gross income. Next, Montclair's expert applied a five (5%) percent vacancy and collection loss factor to the potential gross income figure to calculate the subject property's effective gross income.






Thus, the experts' potential gross income calculations differed from $74,808 to $98,191 during each of the tax years at issue.

2. Analysis

Potential gross income (also referred to as gross rental income), is defined as the "total income attributable to real property at full occupancy before vacancy and operating expenses are deducted." The Dictionary of Real Estate Appraisal, at 148. "It is of course settled that gross rental income for purposes of applying the capitalized income approach to valuation of property is to be taken at 'fair rental value,' professionally termed 'economic' rent or income, if that differs from current actual rental. However, actual income is a significant probative factor in the inquiry as to economic income." Parkview Village Assocs. v. Collingswood Borough, 62 N.J. 21, 29 (1972). As eloquently expressed by our Supreme Court:

> [i]n the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project . . . functioning as customary with leases of relatively short length, should be deemed *prima facie* to represent its fair rental value for purposes of the capitalized income method of property valuation. A court or taxing agency should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent.
>
> [Id. at 34.]

Thus, the actual rents paid by tenants of a well-managed apartment complex should be viewed by a trial court as competent evidence of economic rent. Parkway Vill. Apartments Co., 108 N.J. at 271; Glen Wall Assocs. v. Wall Twp., 99 N.J. 265, 275 (1985); Equitable Life Assur. Soc. of U.S. v. Secaucus Town, 16 N.J. Tax 463, 466 (App. Div. 1996); G & S Co. v. Borough of Eatontown, 2 N.J. Tax 94, 98 (Tax 1980), aff'd, 6 N.J. Tax 218 (App. Div. 1982); 525 Realty Holding Co. v. Hasbrouck Heights, 3 N.J. Tax 206, 218 (Tax 1981).






Therefore, when an apartment complex enters into traditional one-year lease agreements with its tenants, and conducts its operations prudently, responsibly, and in a manner consistent with other similarly situated properties in the marketplace, it should be viewed as "well-managed." Moreover, the court is required to accord the taxpayer a "presumption that actual rent equals economic rent." Glen Wall Assocs., 99 N.J. at 275-76 (quoting Parkview Village Assocs., 62 N.J. at 34). Accordingly, "[a]n analysis of rents must begin with the *present* rent schedule for the subject property." Brunetti v. City of Clifton, 7 N.J. Tax 161, 172 (Tax 1984) (emphasis in original). When credible, the "actual rent roll" as of the "critical assessing date" is a fundamental predicate to determining the property's true or market value. Glen Wall Assocs., 99 N.J. at 274.

However, a municipality can overcome the "well-managed" presumption by presenting the court with "'convincing evidence' that (1) the leases are not economic because the property is not well managed, (2) the leases are not economic because they are old, long[-]term leases, or (3) the leases are not economic as shown by a comparison with at least four comparable apartment properties." Parkway Village Apartments Co. v. Cranford, 108 N.J. 266, 272 (1987). Thus, in the absence of convincing testimony to the contrary, the "gross rental value of the property on the respective assessing dates . . . based on the actual rent rolls," should be viewed as the most trustworthy evidence of potential gross income. Jefferson House Investment Co. v. Chatham, 4 N.J. Tax 669, 676-77 (Tax 1982).

a.   Plaintiff's expert

Here, the evidence and testimony adduced during trial revealed that a material flaw existed in plaintiff's expert's potential gross income analysis and calculations. The flaw was highlighted during cross-examination when plaintiff's expert was asked to reconcile the eighteen (18) residential units reported on plaintiff's rent rolls with exhibits P-2 and P-3 stating that the subject






property contains "nineteen (19) residential units." During said cross-examination exchange, plaintiff's expert became tense and unsettled as he defensively recited, "I observed eighteen and the rent roll had eighteen." Moreover, cross-examination further revealed that rent table prepared by plaintiff's expert failed to account for the presence of a nineteenth residential unit during any of the tax years at issue. Importantly, cross-examination questioning disclosed that plaintiff's expert's value conclusions would "possibly" change if the evidence disclosed that the subject property has nineteen (19) residential units. In sum, the court finds that plaintiff's expert was unaware of the actual number of residential apartment units in the subject property.

Additionally, plaintiff's expert's opined that the subject property has a superintendent residing in "Room 836C6." However, when questioned how long the superintendent resided in the building and occupied that apartment, plaintiff's expert stated, "I don't know, um, I know it showed up in 2020 on the rent roll and that same person is in the rent roll all the years, . . . we were never able to figure out why on the last year, 2020, they no longer paid rent . . . that same name is listed in the rent roll for all years . . . but they were paying rent . . . but I'm just going with what was provided to me." Thus, although plaintiff's expert observed that an anomaly existed with respect to the presence of a superintendent and the plaintiff's rent rolls, he either elected not to inquire with the property owner/manager to obtain clarification or make an inquiry. The response failed to provide any clarity on those issues. Nevertheless, plaintiff's expert did not possess a clear understanding of how many residential apartment units the subject property consisted of, what business arrangement the superintendent had with the property manager, or what apartment unit the superintendent resided in.

Moreover, because plaintiff's expert did not know what financial arrangement the property owner/manager had with the superintendent, he could offer only hypothetical and speculative






testimony regarding what that business relationship might have involved. For example, if the subject property has a superintendent residing in the nineteenth residential unit (as Montclair's expert concluded), what were the terms of employment or compensation, and how did those terms impact the property's potential gross income. Stated differently, if the superintendent is afforded partial free rent in consideration for employment, then that portion of rent actually paid by the superintendent must be accounted for in determining the subject property's potential gross income. Conversely, if the superintendent receives free rent in consideration for his employment, the court questions where plaintiff accounted for this free rent in their rent rolls or with any associated payroll expenses on their income and expense statements.[13] Further, if the superintendent occupies the nineteenth residential unit, then plaintiff's expert's 2020 rent table, reciting that a "super" resides in unit 836C6 is incorrect, and his potential gross income calculation for the 2021 tax year would also be incorrect. Additionally, if unit 836C6 was actually occupied by the building's superintendent, then why was such rent being included in plaintiff's expert's calculation of potential gross income for the 2018, 2019, and 2020 tax years?

Finally, the court questions plaintiff's expert's knowledge and familiarity with the subject property, including the scope and extent of his personal inspection. During direct examination, plaintiff's expert stated that he inspected the subject property, including its interior hallways, common areas, and basement. However, cross-examination revealed that plaintiff's expert inspected only one residential unit. Moreover, he was unable to recall which apartment he inspected or what floor the apartment was located on. Further, when asked whether the subject

---

[13] Plaintiff's expert testified during direct examination that he performed an analysis of the subject property's income and expense statements, categorizing and separating plaintiff's nineteen expense categories into five general categories. None of the nineteen categories were identified as payroll expenses.






property's basement contains a residential unit, he responded, "none that I observed . . . [but,] I can't say that I walked through 100% of the basement." In addition, plaintiff's expert did not know basic information about the subject property's apartment units and operations, including, whether the apartments were separately metered for natural gas, whether all the one-bedroom and all the two-bedroom apartments possessed identical layouts, and whether all the one-bedroom and two-bedroom apartments had the same square footage.

The court is cognizant that our Supreme Court has directed trial courts to view the "current ongoing income scale of a large, well-managed apartment project . . . [as] *prima facie* to represent its fair rental value for purposes of the capitalized income method of property valuation." Parkview Vill. Assocs., 62 N.J. at 34. However, as the Court emphasized in Parkview Vill. Assocs., the application of a fifteen percent upwards market rent adjustment was not "supported by substantial credible evidence on the whole record, allowing for . . . evaluation of the credibility of witnesses." Ibid. Here, the credibility of plaintiff's rent rolls, plaintiff's expert, plaintiff's expert's rent table, and the reported "ongoing income scale" of the subject property are dubious, as the actual rent rolls forming the basis of plaintiff's expert's potential gross income reflect eighteen (18) residential units, while plaintiff's Certified Answers to Standard Interrogatories reflect that the property consists of "nineteen (19) residential units." Based on the court's consideration of the totality of the evidence adduced during trial, the court is unable to reconcile what, if any, rent was received by plaintiff for the nineteenth residential unit and what rent, if any, should be ascribed to the nineteenth residential unit in determining the subject property's potential gross income during any of the tax years at issue.

For the above-stated reasons, the court does not find, based on a fair preponderance of the evidence, that plaintiff has presented the court with credible evidence of the subject property's






potential gross income. Accordingly, because the court does not possess credible evidence of the subject property's potential gross income, the court must reject plaintiff's expert's value conclusions.

> b. Montclair's expert

At the outset, the court highlights that Montclair's expert's frustration with the discovery furnished in this matter was evident during trial. Montclair's expert explained that he was "taken aback" that his February 3, 2022 inspection of the subject property was "limited to one unit." Moreover, Montclair's expert's testimony revealed that his valuation and appraisal process was hindered because "we had requested the information for rentals from defendant's attorney . . . but we weren't provided with all the information that we asked for." Further, Montclair's expert characterized the discovery information furnished as "limited, as far as what was provided."

After reviewing and analyzing the rent rolls provided, Montclair's expert questioned why the rents varied so greatly for one-bedroom and two-bedroom units located in the subject property.[14] According to Montclair's expert, "it just didn't make sense to me." Montclair's expert testified that he searched the Garden State Multiple Listing Service to attempt to locate rental offerings for the subject property; however, he was able to find only three listings dating back to 2005. In Montclair's expert's opinion, "I am cognizant of what other similar apartment buildings are getting, having appraised [other apartment complexes in Montclair] . . . I know what the rents are, what they should be getting and what they are getting, and I determined that the existing rents . . . were the product of . . . long-term tenancies and they weren't reflective of the market."

---

[14] Montclair's expert highlighted that the August 2018 rent roll reflected unit A2, a two-bedroom apartment, had a monthly rent of $1,085, while unit A3, a two-bedroom apartment located on the same floor, had a monthly rent of $1,465 per month.






According to Montclair's expert, because the subject property includes several long-term tenants (as of the October 1, 2017 valuation date, approximately seven tenants occupied units for more than five years), he speculated that their rents must not have been annually increased to market-rate rents. Thus, Montclair's expert opined that the subject property's rent rolls consisted of below-market rents. In sum, Montclair's expert concluded that, "I don't believe this is a well-managed property." Accordingly, Montclair's expert embarked on an examination of twelve comparable apartment complexes in Montclair to calculate a stabilized economic or market rent to apply to the subject property's one and two-bedroom residential units, as of each valuation date.

However, as recited by our Supreme Court, to overcome the presumption accorded a well-managed apartment complex, a municipality must present "convincing evidence" satisfying one of the following three criteria: (i) the leases do not represent economic or market rent because the property is not well-managed; (ii) the leases do not represent economic or market rent because they are outdated, long-term lease agreements; or (iii) the leases do not represent economic or market rent as demonstrated by a "comparison with at least four comparable apartment properties." Parkway Village Apartments Co., 108 N.J. at 272. For the reasons set forth herein, the court finds that Montclair has failed to present the court with convincing evidence satisfying any of the three criteria.

During cross-examination, Montclair's expert readily admitted that he was unfamiliar with plaintiff's principal's business and property management proficiency. Without a basic and adequate understanding of how the plaintiff and its principal conduct business operations and any conclusion that the subject property's management is inept is of dubious value. An expert's opinion lacking a credible foundation and "consist[s] of bare conclusions unsupported by factual evidence is inadmissible." Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002).






The expert's opinion must have objective support and may not be based on a standard that is strictly personal. See Pomerantz Paper Corp. v. New Comm. Corp., 207 N.J. 344, 373 (2011). The worth, significance, and "probative utility of an expert's opinion stands or falls on the facts and reasoning offered in its support." Bonsangue, 316 N.J. Super. at 284. Here, Montclair's expert possessed no personal knowledge or information about plaintiff's principal or how the subject property is being actively managed (other than his review of rent rolls) to enable him to arrive at his conclusion that the subject property is not well-managed.

The court emphasizes that although Montclair's expert's speculation about why the subject property has disparate monthly rental rates may be accurate, several other market-driven factors, not dependent on the length of a tenant's occupancy, could rationally explain the disparities in the monthly rent. For example, the subject property's rents could be impacted by different unit sizes, renovations or updates undertaken to the interior of certain units, unit floorplans or layouts more or less advantageous or suitable for individuals and families, unit locations (first floor versus third floor in a walk-up building), or unit privacy/views (window views looking out onto the common courtyard versus views in the rear of the building looking into the immediately adjacent building only a few feet away).

Moreover, the court's own examination of the rent rolls discloses that the monthly rent charged for the "A6" and "B6" style one-bedroom apartment units are generally lower than the rents for other one-bedroom apartment units in the complex. Therefore, it is also possible that the "A6" and "B6" apartment units are smaller, have not been updated, possess less privacy, or do not have a floorplan as functional as other units. However, without more certain and concrete evidence about the tenancies and the composition, quality, or design of these units, the court cannot






conclusively state that the monthly rents ascribed to these units were the product of poor management and/or long-term tenancies, and do not accurately represent fair rental value.

The court emphasizes that plaintiff's expert offered uncontroverted evidence that plaintiff's principal is regularly engaged in the management of approximately 935 residential units in New Jersey, has a full-time staff dedicated to the management of his properties, and conducts its operations in a manner that is customary for the industry. Moreover, Montclair's expert accepted several of the actual expenses reported on plaintiff's income and expense statements as credible evidence of stabilized expenses for an apartment complex. Accordingly, Montclair's expert's conclusion that the subject property is not well-managed is unsupported by any factual, objective evidence in the record and, therefore, must be rejected by the court.

In addition, during trial, credible testimony was adduced from both plaintiff's expert and Montclair's expert that based on their review of the discovery information furnished, including the rent rolls, plaintiff offers its tenants one-year residential lease agreements. In sum, no evidence was presented by Montclair that the subject property leases are not economic because they are old, long-term leases.

Finally, the court turns its attention to the third criteria. Did Montclair present the court with convincing evidence that the subject property's rents are not market-based on "a comparison with at least four <u>comparable apartment properties</u>"? <u>Parkway Vill. Apartments Co.</u>, 108 N.J. at 272 (emphasis added).

Montclair's expert testified that he collected rental information from twelve (12) apartment complexes in Montclair across all the valuation dates. However, the court highlights that eleven of the apartment complexes identified by Montclair's expert have on-site parking, a key amenity






that the subject property clearly lacks.[15]  Moreover, the only apartment complex identified by Montclair's expert without on-site parking, 188 Bellevue Avenue, is in Upper Montclair, approximately two blocks from the Upper Montclair Commuter Rail Station.  Thus, the court questions how much of a premium the market applies not only to apartment complexes with on-site parking but also to a potentially superior location.

In addition, the court observes that 28 Gates Avenue, 188 Bellevue Avenue, 44 Union Street, 39-41 North Fullerton Avenue, 145 Chestnut Street, and 57 Walnut Street are all located within a reasonable walking distance to one of the NJ Transit commuter rail stations serving Montclair.  However, the subject property is located more than one mile away from the closest commuter rail station.  Therefore, the court further questions how much of a premium the market applies to apartment complexes that are more suitable for commuters seeking daily transportation into Newark or New York.

The court further observes that although Montclair's expert testified that all the comparable rental properties are in a similar condition to the subject property, the description for 28 Gates Avenue (contained in the Addenda to Montclair's expert's appraisal report) reveals that "twenty-seven (27) units have been renovated with new kitchens and baths."[16]  Moreover, during cross-examination Montclair's expert revealed that 55 North Mountain Avenue had the "interior foyers

---

[15]  Montclair's expert presented conflicting evidence with respect to the presence of on-site parking.  Under his appraisal report, Montclair's expert states that 28 Gates Avenue "does not feature on-site parking.  However, a municipal parking lot is located directly opposite the subject property for local resident (permit) use."  However, during cross-examination, Montclair's expert stated that the property owner has "a parking lot across the street on a first come first serve basis. . . I assumed on my analysis that the rent that did include that additional parking, that's why I discounted it."

[16]  The Addenda to Montclair's expert's report only contained detailed descriptions and photos of 28 Gates Avenue, 55 North Mountain Avenue, and 188 Bellevue Avenue.






and common hallways . . . redone . . . last year," placing them in a "modern" condition. In addition, the court's review of the description for 55 North Mountain Avenue (contained in the Addenda to Montclair's expert's appraisal report), reveals the presence of "eighteen (18) individual garages, nineteen (19) surface parking spaces, and two large[-]landscaped areas featuring exterior patios." These are clearly amenities that the subject property does not possess. The court further highlights that cross-examination disclosed that 39-41 North Fullerton Avenue's building is serviced by an elevator, an amenity that the subject property clearly does not possess. Thus, the court questions how much of a premium the market will apply to a three or four-story apartment complex with an elevator. Cross-examination also disclosed that 16 Forest Street is a single-family residential condominium unit, not an apartment; thus, it possesses characteristics and attributes very different from the subject property.

Cross-examination further disclosed that Montclair's expert personally inspected only three of the comparable apartment complexes, 28 Gates Avenue, 188 Bellevue Avenue, and 55 North Mountain Avenue. He did not inspect 44 Union Avenue, 39-41 North Fullerton Avenue, or 16 Forest Street but rather reviewed the Garden State Multiple Listing Service information for these properties and conferred with the listing brokers.[17] Thus, the court questions how he arrived at his conclusion that all the apartment complexes are in substantially the same condition as the subject property.

Further, in determining his market rents, Montclair's expert expressed that he considered several factors in adjusting the comparable apartment market rentals, including, differences in

---

[17] No testimony was elicited during trial from Montclair's expert regarding whether he conducted inspections of 5 Roosevelt Place, 370 Claremont Avenue, 14 Baldwin Street, 145 Chestnut Street, 57 Walnut Street, or 39 Harrison Avenue.






size, number of rooms, condition, availability of parking, general appeal, and location. However, Montclair's expert offered no testimony regarding what data or information he relied on to compute the adjustments to the market rents to discern the subject property's market rent. For example, for the 2018 tax year, the range of Montclair's expert's one-bedroom comparable apartment rentals was $1,400 to $1,725. However, Montclair's expert determined the subject property's estimated market rent to be $1,300. Thus, how did he calculate and apply his adjustments to the range of market rents to arrive at the subject property's concluded market rent of $1,300? It is well-settled that "differences between a comparable property and the subject property are anticipated. They are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987). An appraiser must establish appropriate "elements of comparison for a given appraisal through market research and support those conclusions with market evidence." Appraisal Institute, The Appraisal of Real Estate 390 (14th ed. 2013). Adjustments must have a "foundation obtained from the market, and where appropriate, [be] supported by cost manuals." Greenblatt v. Englewood City, 26 N.J. Tax 41, 55 (Tax 2011). Hence, the probative value of an expert's opinion hinges upon the similarities which can be drawn between the properties and the objective market data utilized to support adjustments thereto. Here, Montclair's expert offered no objective market data in support of the "factors" or adjustments he applied to the comparable market rents in arriving at his concluded market rents.

Finally, cross-examination disclosed that in or about March 2020, plaintiff executed a one-year lease with a new tenant for unit C3, a one-bedroom apartment, at a monthly rent of $1,250. However, Montclair's expert found the market rent for that unit should be $1,400 per month. In






Montclair's expert's opinion, "one isolated lease or rental in this property wasn't going to influence my determination of market rent . . . , one lease in the subject property . . . doesn't indicate that it should be adopted for all the units."  Similarly, the rent roll disclosed that on or about September 1, 2020, plaintiff executed a one-year lease with a new tenant for unit B3, a two-bedroom apartment, at a monthly rent of $1,632.  However, Montclair's expert found the market rent for that unit should be $1,850 per month.  Yet, Montclair's expert did not identify any of the subject property's new tenant rentals as comparable and competitive market rents.

The court acknowledges that contract rent and economic or market rent are not always synonymous.  "Contract rent is that rent which is 'payment for the use of property, as designated in a lease.'  Economic rent is the 'rental warranted to be paid in the open real estate market based on current rentals being paid for comparable space.'  There is no doubt that economic rent or fair market rental if it differs from actual or contract rent must control."  Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445 453 (Tax 1980) (internal citations omitted); New Brunswick v. State of N.J., Div. of Tax Appeals, 39 N.J. 537, 544 (1963); Parkview Village Assocs., 62 N.J. at 29.  However, the actual rent negotiated under an arms-length lease, executed in close proximity to the valuation date is not to be disregarded.  McCrory Stores Corp. v. Asbury Park, 89 N.J. Super. 234, 243 (App. Div. 1965).  "'[I]n determining what is fair rental income, the actual rental income, while not controlling, is an element to be considered.'"  Ibid. (quoting Somers v. City of Meriden, 174 A. 184, 186 (Sup. Ct. Err. 1934)).  "Indeed, it may be that contract rent is a significant factor in the search for economic income."  Dworman, 1 N.J. Tax at 453 (citing Parkview Village Assocs., 62 N.J. at 30).

Here, plaintiff executed leases with new tenants for the subject property's units on or about the respective valuation dates.  The court observes that those leases may be probative evidence of






the marketplace's reaction to units becoming vacant at the subject property. While Montclair's expert should not have blindly accepted these leases as evidence of market rent, he also should not have discarded them from his consideration. Montclair's expert repudiation of plaintiff's timely new tenant leases without credible evidence why those leases should be rejected causes the court to further question the accuracy and validity of Montclair's expert's comparable rental properties and derived market rents.

For the above-stated reasons, the court does not find that the twelve apartment complexes identified by Montclair's expert are comparable to the subject property. The court finds that Montclair has not presented the court with convincing evidence overcoming the presumption afforded to large, well-managed apartment complexes. Accordingly, because Montclair has not presented the court with convincing and credible evidence of the subject property's potential gross income, the court must reject Montclair's expert's value conclusions.[18]

### III. Conclusion

The court concludes that plaintiff has failed to prove, by a fair preponderance of the evidence, that the 2018, 2019, 2020, and 2021 tax year assessments on the subject property exceed its true value. In addition, the court further concludes that Montclair has failed to present

---

[18] Although Montclair's expert observed that the subject property's superintendent occupies the nineteenth basement apartment, Montclair's expert offered no testimony or evidence regarding the business relationship or agreement that exists between the superintendent and the plaintiff. He speculates, without any data or evidence, that the superintendent is "provided [free rent] as part of his salary or in lieu of salary." However, in attempting to discern the subject property's gross potential income and value, the court cannot assume what the terms are of that business relationship. For example, if the superintendent is responsible for partial rent or any other sums to plaintiff, such income must be accounted for under the subject property's gross rental income or gross potential income. However, without adequate information, the court cannot speculate as to that relationship and how that arrangement may impact the subject property's gross potential income.






convincing evidence overcoming the presumption afforded to large, well-managed apartment complexes.

Accordingly, for the foregoing reasons, the court will enter judgments affirming the local property tax assessments in these matters.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.




